UNITED STATES of America,

v.

Jack L. WILLIAMS and Archibald R. Schaffer III, Defendants.

Criminal Action No. 96–0314 (JR).

United States District Court, District of Columbia.

Sept. 22, 1998.

Robert W. Ray, Chief Assoc. Independent Counsel, Will Frentzen, Assoc. Independent Counsel, Alexandria, VA, for U.S.

Barry W. Levine, Dickstein, Shapiro, Morin & Oshinsky, L.L.P., Washington, DC, for Jack L. Williams.

William H. Jeffress, Jr., Miller, Cassidy, Larroca & Lewin, LLP, Washington, DC, W.W. "Woody" Bassett, Bassett law Firm, Fayetteville, AK, for Archibald R. Schaffer III.

## MEMORANDUM

ROBERTSON, District Judge.

On June 26, 1998, a jury found Jack L. Williams guilty on two counts of making false statements to federal agents in violation of 18 U.S.C. § 1001 and Archibald R. Schaffer III guilty on one count of violating the federal gratuity statute, 18 U.S.C. § 201(c), and one count of violating the Federal Meat Inspection Act, 21 U.S.C. § 622. Messrs. Williams and Schaffer have both moved pursuant to F.R.Crim.P. 29 for judgments of acquittal or in the alternative pursuant to F.R.Crim.P. 33 for new trials. For the reasons set forth in this memorandum, both of Mr. Williams' motions will be denied, and Mr. Schaffer's motion for judgment of acquittal will be granted.

1. *Applicable legal standards*

After a jury has spoken, a court considering a motion for judgment of acquittal must "view the evidence in the light most favorable to the government, allowing the government the benefit of all reasonable inferences that may be drawn from the evidence, and permitting the jury to determine the weight and credibility of the evidence." *U.S. v. Thorne,* 997 F.2d 1504, 1509 (D.C.Cir.) *cert. denied,* 510 U.S. 999, 114 S.Ct. 568, 126 L.Ed.2d 467 (1993) (citation omitted). The prosecution's evidence supporting a guilty verdict must be found sufficient if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the central elements of the crime beyond a rea-

sonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original); *U.S. v. Applewhite*, 72 F.3d 140, 142 (D.C.Cir.1995), *cert. denied* 517 U.S. 1227, 116 S.Ct. 1864, 134 L.Ed.2d 962 (1996).

A district court may grant a new trial "if required in the interest of justice." F.R.Crim.P. 33. To succeed on his motion for a new trial, a defendant "must overcome a strong presumption ... in favor of upholding the jury verdict." *U.S. v. Rogers*, 918 F.2d 207, 213 (D.C.Cir.1990), *cert. denied*, 510 U.S. 906 (1993) (*citation omitted*). In considering such a motion, the trial court "weighs the evidence and evaluates the witnesses' credibility and decides whether 'a serious miscarriage of justice may have occurred.'" *Rogers*, at 213, *quoting Tibbs v. Florida*, 457 U.S. 31, 38 n. 11, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1980).

2. *Jack Williams' motion for judgment of acquittal*

The case against Mr. Williams involved statements he made in two interviews. The first was conducted by two agents of the Department of Agriculture on March 22, 1994. The jury heard testimony from one agent that, in response to questions about whether or not Secretary Mike Espy had attended a Dallas Cowboys football game in January of that year as the guest of Tyson Foods, Mr. Williams

"said he didn't know if that had happened. He said he'd read some news sources that said it may have happened. He heard some rumors. But he didn't know if it actually—he didn't know if the Secretary actually went, he didn't know if it actually happened. I asked him do you have any firsthand knowledge about whether the Secretary went down there and attended that game in the presence of Don Tyson. He said that he didn't have any firsthand knowledge. He said he didn't have any." (Tr. 192).

The other agent, testifying about the same interview, said that he asked Mr. Williams whether he "knew about how Mr. Espy got to the game, who paid for it, and so forth," Tr. 781, and that Mr. Williams responded "that he had only heard through rumor ... and news report that [Secretary Espy] had been at the game and he did not know if he had actually attended." (Tr. 781).

The evidence that Mr. Williams' statements were false included the testimony of Cleta Selman, an executive secretary at Tyson Foods, that Mr. Williams contacted Tyson Foods to coordinate the travel schedules of Secretary Espy and his girlfriend to attend the football game and to coordinate their hotel accommodations and ground transportation (Tr. 267–68). A travel agent also testified that Mr. Williams purchased an airline ticket for Secretary Espy's girlfriend to travel from Washington, D.C. to Dallas on January 15, 1994 and return to Washington the next day, and that he charged the ticket to his Visa credit card account (Tr. 1179–1181).

Clearly Mr. Williams had knowledge about Secretary Espy's attendance at the game that went beyond rumors and news reports. Mr. Williams argues, however, that the questions put to him at the March 22 interview were not precise enough to require him to tell what he knew; that the testimony of the two agents, unsupported by a recording or a verbatim transcript, was insufficient proof of exactly what the questions were; that the questions were ambiguous; that his statements were literally true; and, that, in any event, considering the knowledge USDA already had that Secretary Espy had indeed attended the football game, the statements were not material.

The second interview was conducted on June 9, 1994, by two FBI agents. The jury heard testimony that, in that interview, Mr. Williams said that "he had never spoken to (Secretary Espy's girlfriend) on the phone, he had never called her and she had never called him," (Tr. 665); that "he had not spoken to her for any reason at all including to make travel arrangements," (Tr. 665); and that "he learned about those trips that Secretary Espy took after they occurred. He wasn't involved in making any arrangements for them, and ... he didn't know about Secretary Espy going to [sic] those trips ahead

of time." (Tr. 666).[1] The evidence that Mr. Williams' statements were false included Cleta Selman's testimony about travel arrangements, *supra,* and the testimony of Secretary Espy's girlfriend that she had indeed talked to Jack Williams by telephone—about a Tyson Foundation scholarship (Tr. 1099) and about her need for an airline ticket to get to Dallas (Tr. 1110–1112).

Mr. Williams' arguments about the June 9 interview, like his argument about the March 22 interview, assert the insufficiency of the government's proof of what the questions were, the literal truth of his statements, the immateriality of his statements, and the ambiguity of the agents' questions. Mr. Williams also argues with regard to the June 9 interview that he must be granted a judgment of acquittal because the verdict does not specify which of the statements the jury found false and because the agents did not warn him that his statements might subject him to criminal liability.

a. *The agents' questions and Mr. Williams' answers*

■ Mr. Williams invokes the cautionary language of the Court of Appeals in *United States v. Poindexter,* 951 F.2d 369, 388 (D.C.Cir.1991), about "the difficulty of proving beyond a reasonable doubt exactly what the defendant said and whether he intended to deceive his audience as to a material question of fact...." He points out that all four of the testifying agents, in various ways, conceded their inability to recite the exact questions or Mr. Williams' exact answers (Tr. 216, 672–73, 765, 1200). There is, however, no requirement that a conviction under 18 U.S.C. § 1001 be supported by stenographic transcripts or electronic recordings of the questions and answers. *Marzani v. U.S.,* 168 F.2d 133 (D.C.Cir.), *aff'd, by an equally divided court,* 335 U.S. 895, 69 S.Ct. 299, 93 L.Ed. 431 (1948). In his opening statement, his cross-examination of the agents, and his closing argument, counsel urged pointedly and repeatedly that the jury should have no confidence in the agents' testimony because there was no recording or transcript. The

jury disagreed. Viewing the evidence in the light most favorable to the prosecution, I cannot say that no rational trier of fact could have found beyond a reasonable doubt that the questions and the answers were as the agents testified.

b. *Literal truth*

Mr. Williams asserts that it was literally true that he had no firsthand knowledge that Secretary Espy had been at the Dallas game. The jury was given the instruction on literal truth requested by the defense (Tr. 1782). They could easily have determined on the basis of the testimony that Mr. Williams had more information than what he had heard through rumors and news reports.

c. *Materiality*

■ A false statement is material if it "ha[s] a natural tendency to influence, or [is] capable of influencing the decision of the decisionmaking body to which it [is] addressed," *U.S. v. Gaudin,* 515 U.S. 506, 508–10, 115 S.Ct. 2310, 2313, 132 L.Ed.2d 444 (1995) (citation omitted). Materiality is a fact issue for the jury. *Id.* at 2311. There was testimony that the agents in the first interview were trying to find out, not only whether or not Secretary Espy actually attended the Dallas game, but also what else Mr. Williams knew about the subject. The second interview involved more targeted questions about travel arrangements for Secretary Espy's girlfriend. The government's proof that it did not learn until October 20, 1994, that Mr. Williams had actually paid for her airfare, Tr. 759, was sufficient to support the jury's verdict as to materiality.

d. *Ambiguity of the questions*

Mr. Williams argues that the verdict is defective as a matter of law because the agents' questions were fundamentally ambiguous. The charges against Mr. Williams were that his *statements* were false, however. The jury could reasonably have concluded that Mr. Williams' statements that he had only heard about Secretary Espy's attend-

---

1. Other allegedly false statements were made in the June 9 interview, but they need not be considered here because proof of one was sufficient to violate § 1001.

ance at the Dallas game "through rumor ... and news reports," and that he had never spoken to Secretary Espy's girlfriend on the telephone for any reason, were false statements, no matter what the questions were that elicited them.

### e. *Ambiguity of the verdict*

Mr. Williams asserts that because it cannot be known which one or ones of the four false statements charged in Count Fifteen was or were the basis of the jury's verdict, judgment must be entered for the defendant if any one was too ambiguous to support conviction. I ruled on this point after Mr. Williams' first trial (June 4, 1997 transcript, p. 32) and adhere to that ruling: there was nothing fundamentally ambiguous in any of the four statements made to the FBI agents.

### f. *Warnings to Jack Williams*

■ Mr. Williams reasons that, because government agencies often choose to warn citizens that making a false written statement to the government is a crime, F.B.I. agents are obligated to issue warnings before interviews that making a false oral statement is also a crime. This proposition is not the law. Appellant was not in custody, and there was no criminal charge pending against him. Compare *Massiah v. U.S.*, 377 U.S. 201, 207, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

### 3. *Jack Williams' motion for a new trial*

### a. *Prosecution misstatements made in closing argument*

■ The first ground of Mr. Williams' motion for a new trial is that the prosecution misstated the record in a prejudicial way in final argument. Mr. Williams attempts both to rely on language found in *United States v. North*, 910 F.2d 843, 895 (D.C.Cir.1990), and to distinguish the result of that case (no substantial prejudice), by pointing out that the case against him was markedly thinner than the case against Colonel North. After

reviewing the record, however, I conclude that the prosecutor's misstatement of the record does not come close to meeting the applicable test—whether "the prosecutors' comment so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). The jury was promptly advised, and later formally instructed, that its recollection would control.

### b. *Jury instructions*

■ The jury was instructed that the first element of a § 1001 violation is "ma[king] a statement or representation to the government ... as testified to by the government's witnesses." (Tr. 1781). Mr. Williams asserts that that instruction improperly allowed the jury to find him guilty of making false statements that were not alleged in the indictment. Mr. Williams did not object to the instruction. In fact, the transcript reflects an "ad lib" attempt to conform the prepared instruction to Mr. Williams' request that the indictment not be sent back to the jury during its deliberations. (Tr. 1781, 1665–66). In any event, every alleged false statement about which government agents testified was included in the indictment.

Mr. Williams also assigns error to my decision not to instruct the jury that, in order to find defendant guilty on Count Fifteen, it must decide unanimously as to at least one of the four charged statements. Mr. Williams did not object to the instruction as given.

■ Mr. Williams asserts that it was error to refuse his proposed instruction that the jury should "not ... examine the isolated segments of the question and answer exchange, but instead ... view Mr. Williams' answers within the context of the entire line of questioning for both interviews." Similarly, Mr. Williams argues that I erred in giving a Redbook[2] instruction as to materiality, refusing his proposed instruction about the purpose of materiality. It is established that

**2.** Young Lawyers Section of the Bar Association of the District of Columbia, *Criminal Jury Instructions for the District of Columbia* (4th ed.).

"[t]he trial court is required to give a proper instruction, and to instruct on the defendant's theory of the case if supported by the evidence. The court is not required to give the instruction in the specific language requested by the defendant." *U.S. v. Tarantino,* 846 F.2d 1384 (D.C.Cir.1988) (citation' omitted).

Mr. Williams' final contention, with regard to jury instructions, is that the jury should have been instructed that he could not be found guilty of a § 1001 violation in the absence of proof that he understood that the statements he made were false. The jury was indeed instructed that in order to convict, it must find that Mr. Williams acted knowingly—"with awareness and comprehension"—and wilfully—"deliberately, voluntarily, and intentionally" (Tr. 1781–82).

4. *Archibald Schaffer's motion for judgment of acquittal*

Mr. Schaffer was found guilty of providing things of value to Secretary Espy on two separate occasions, first in connection with President Clinton's inaugural dinner in January 1993, and then in connection with Don Tyson's birthday party in Russellville, Arkansas, in May 1993. The jury found that Mr. Schaffer violated the federal gratuity statute with respect to the inaugural dinner and the Meat Inspection Act with respect to the Russellville birthday party.

The details of Mr. Schaffer's actual involvement with these two events and the extent of his involvement were disputed at trial, but a reasonable jury could have found on the basis of the evidence that Mr. Schaffer gave, or aided and abetted in the giving of, things of value to Secretary Espy on or with respect to both occasions.

Also disputed at trial was an issue that is dispositive on the instant motion for judgment of acquittal, namely, the intent with which the things of value were given. Were they given for or because of official acts or with the intent to influence official acts? Or, as defendant insists, were they were given merely to keep the Secretary happy, or to create a better relationship, or in the vague hope of inducing warm feelings, or to win generalized sympathy, or to ingratiate himself or his company with the Secretary, or to celebrate Secretary Espy's status, any of which, or all of which in combination, would not amount to criminal intent under *United States v. Sun–Diamond Growers,* 138 F.3d 961 (D.C.Cir.1998)?

The *Sun–Diamond* decision required that evidence of unlawful gratuities focus on official acts. The language of the Meat Inspection Act required the same focus for Meat Inspection Act charges. That focus had an important effect on shaping the evidence at trial and the jury instructions. Mr. Schaffer moved before trial for a bill of particulars. The motion was denied, Order of March 2, 1998, upon a finding that the indictment outlined with sufficient specificity "two proposed rules and policies that were pending before the USDA in which Tyson Foods had an interest...." *Id.* Those two "proposed rules and polices" concerned food safety issues that became known in the lingo of the trial as "zero tolerance" and "safe handling labels." The prosecution agreed that zero tolerance and safe handling labels marked the boundaries of its case. The jury instructions under both the Meat Inspection Act and the federal gratuities statute expressly referred to zero tolerance and safe handling labels. The jury was instructed that, under the Meat Inspection Act, the requisite intent was

"to influence Secretary Espy in the performance of any duty under the Meat Inspection Act.... Among the duties prescribed by the Meat Inspection Act, the Secretary of Agriculture was responsible for enforcement of and promulgation of regulations *regarding safe handling labels,* and *zero tolerance* for contamination of beef and pork."

"If a defendant intended to influence to any degree the Secretary's actions *with regard to either one of these issues* by giving things of evaluate [sic], then he had the requisite criminal intent to violate the Meat Inspection Act." (Tr. 1777–78) (emphasis added).

With respect to the gratuities statute, the jury was instructed that one of the elements was

"[making] the gift, offer or promise for or because of any official acts." . . .

"It is not a crime to give things of value to a public official merely to get cozy or in hopes of inducing warm feelings towards the giver or the giver's employer. You may find . . . Mr. Schaffer guilty of the offense of giving an illegal gratuity only if you find beyond a reasonable doubt that a gift or gifts were given to Secretary Espy with the intent of rewarding him for some specific official act he had done in the past *concerning safe handling labels or zero tolerance,* or with the intent of making him more likely *to do something in the future about one or both of those subjects* that would be favorable to Tyson Foods."

"It is not necessary that the government prove that any particular gift was earmarked for any particular official, nor is it necessary for the government to prove that the gift or gifts ultimately succeeded in obtaining favorable treatment." (Tr. 1779) (emphasis added).

a. *Illegal gratuities and the inaugural dinner*

■ There was no evidence that Mr. Schaffer or anybody in Tyson Foods knew of or anticipated anything about zero tolerance or mandatory safe handling labels at the time of the inaugural dinner. The dinner was held on January 18, 1993, the same day on which the first case of E. coli 0157:H7 infection was reported to the Department of Agriculture (GX–116). That case *later* gave rise to a USDA initiative to implement a policy of zero tolerance for fecal matter. The zero tolerance issue simply did not exist on January 18, 1993.[3] The government's proof did not establish that any regulatory action was proposed or pending at USDA on or before January 18, 1993 with respect to safe handling labels.

There was accordingly no evidence upon which any rational trier of fact could have found that Mr. Schaffer's intent in giving inaugural dinner tickets to Secretary Espy was "for or because of" Secretary Espy's actions with respect to either zero tolerance or safe handling labels.

b. *The Meat Inspection Act and the Russellville birthday party*

■ By the time of the Russellville birthday party in May 1993, the E. coli outbreak in the Northwest and the USDA's response to it were well known. USDA had announced in February 1993 that mandatory safe handling labels would likely be part of its initiatives taken in response to the E. coli outbreak, GX–116. The prosecution presented no evidence, however, to establish that Mr. Schaffer or Tyson Foods had any objection or opposition to safe handling labels. The evidence is all to the contrary (Tr. 1428–1446; DX–AS52, AS53, AS54, AS55, AS56, AS57, AS58, AS60). The USDA announced on August 11, 1993—three months *after* the Russellville party—that a label change would be required effective in 60 days. No evidence of any Tyson Food involvement in or concern about the USDA's proposal to require safe handling labels predated that announcement. Tyson Foods' objection, moreover, was not to the fact or content of the regulation, but to its timing. There was no issue about timing in May 1993.

Zero tolerance was a live issue in May 1993, but the E. coli outbreak that gave rise to the issue was confined to beef, and the zero tolerance policy, proposed inside USDA on February 5, 1993 (GX–116) and announced on March 2, 1993 (Tr. 433), related only to beef. The government presented no evidence of any concern on the part of Tyson Foods or Archie Schaffer with respect to the zero tolerance policy for beef. The policy had already been implemented, on March 2, 1993, so the Meat Inspection Act's requisite "intent to influence" that action could not have been present in May. Moreover, the policy related only to "cattle slaughter establishments" (Tr. 434), and there is nothing in the record that rebuts the defendant's proof

---

**3.** There is some indication in the record that USDA's Food Safety & Inspection Service had developed internally a strategic initiative for inspection reform, but the OIC's own proof indicates that this initiative was not presented to Secretary Espy until after he took office—on a date, of course, later than the inaugural dinner. There was no proof that either Secretary Espy or anybody in Tyson Foods knew about this initiative at the time of the inaugural dinner.

that Tyson Foods never owned a single cattle slaughter establishment (Tr. 910, 1305–06). The government's argument that the evidence establishes Mr. Schaffer's "clear inten[t] to influence Espy to hold off imposing 'zero tolerance' for poultry," Oppos. p. 38, does not persuade, because the Meat Inspection Act does not cover poultry. *See* 21 U.S.C. § 601(j).[4]

No rational trier of fact could have found that Mr. Shaffer's intent in giving (or aiding and abetting the giving) of things of values to Secretary Espy in connection with the Russellville party was to influence Secretary Espy in the performances of any duty under the Meat Inspection Act regarding safe handling labels or zero tolerance.

---

4. It was suggested to and even urged before trial that OIC proceed only on the gratuities statute and not the Meat Inspection Act. The OIC declined that suggestion and insisted on charging Mr. Schaffer's conduct with respect to the Russellville birthday party under both statutes. The evidence about Tyson's concern for the potential expansion of zero tolerance to poultry might have supported a jury verdict for violation of the gratuities statute in connection with the Russellville birthday party on the theory that the Secretary was feted "with the intent of making him more likely to do something in the future about [zero tolerance]," (Tr. 1779, Oppos. p. 23). The jury, however—perhaps unwilling to convict Mr. Schaffer twice for the same conduct—acquitted Mr. Schaffer of that charge.