## UNITED STATES of America

### v.

## Glenn HOLCK Stephen M. Umbrell.

## CRIM.A. Nos. 04–370–03, 04–370–04.

United States District Court,
E.D. Pennsylvania.

Oct. 26, 2005.

Michael A. Schwartz, Richard J. Zack, Robert A. Zauzmer, Catherine Votaw, Joseph F. Minni, William B. Carr, Jr., Joan L. Markman, United States Attorney's Office, Philadelphia, PA, for United States of America.

Lawrence S. Lustberg, Crummy, Del Deo, Dolan, Griffinger and Vecchione, Newark, NJ, for Glenn Holck Stephen M. Umbrell.

### *MEMORANDUM*

BAYLSON, District Judge.

## *TABLE OF CONTENTS*

I. Denial of Motion for Judgment of Acquittal ................................... 343
 A. Conspiracy/Honest Services Fraud ...................................... 343
 B. Factual Summary ...................................................... 344
 C. Legal Discussion ..................................................... 348
 1. Banks Loans as a Component of Bribery ............................ 348
 2. Temporal Attenuation between the Quid and the Quo ............... 351
 3. Other Arguments by Holck and Umbrell Re: Conspiracy Law ......... 354
 4. "Conflict of Interest" Prong .................................... 355
 D. Mail Fraud ........................................................... 356

II. Denial of Motion for New Trial ........................................... 356
 A. The Fact that Holck and Umbrell Were Convicted of Conspiracy Is an
 Additional Reason Why They Are Not Entitled to a New Trial Under
 *Dobson* ............................................................. 356
 B. Additional Jury Charge Issues ........................................ 358
 C. Whether a New Trial Should Be granted or a Hearing Held as to Juror
 No. 6's Alleged Failure to Disclose Part–Time Position as a Real
 Estate Agent ......................................................... 360
 1. Alleged Juror No. 6's Misconduct and Bias in "Concealing" Her
 Part–Time Occupation as a Real Estate Agent during *Voir Dire* ... 360
 a. *McDonough* Prong One: Intentional Withholding Of Material
 Information .................................................. 360
 b. *McDonough* Prong Two: Valid Basis for Challenge for Cause ... 362
 2. Introduction of Extrinsic Evidence into Deliberations ........... 364
 3. Hearing Is Not Necessary under the Facts ........................ 367
 D. The Court Allowed Adequate Voir Dire, including the Opportunity of
 Individual Defense Counsel to Question the Potential Jurors .......... 368
 E. The Court Did Not Err in its Ruling on the Admissibility of Evidence ... 371
 1. Admissibility of the Flores and Church Loans .................... 371
 2. Admissibility of the Schnapp Loan ............................... 372
 a. Schnapp Loan as Intrinsic to the Charged Offense ............ 372
 b. Schnapp Loan Admissible under Rule 404(b) ................... 373

 3. Admissibility of Co–Conspirator Statements .........................375

F. There Were No Violations of *Brady v. Maryland* or Other Prosecutorial
 Misconduct .....................................................................376

G. *Ex Parte* Communications with Deputy Clerk Issue ......................376

III. Conclusion ..........................................................379

Glenn Holck ("Holck") and Stephen M. Umbrell ("Umbrell") were convicted of participating in a conspiracy to commit honest services mail fraud and two counts of aiding and abetting honest services mail fraud. The extensive background of this case, which included a lengthy trial, is set forth this Court's prior Memorandum, *U.S. v. Kemp*, 379 F.Supp.2d 690 (2005), and other Memoranda identified therein. The Court issued an Order dated September 29, 2005 denying defendants' motions for acquittal under Rule 29, F.R.Crim. P. which the Court had held under advisement when first made at trial, and for new trial under Rule 33, F.R.Crim. P. The Court imposed sentence on Holck and Umbrell on October 6, 2005.

This Memorandum will review the sufficiency of the evidence as to Holck and Umbrell, and reasons for denial of their Motion for New Trial as to those grounds for which the Court has not yet explained its reasons.

## I. Denial of Motion for Judgment of Acquittal

### A. Conspiracy/Honest Services Fraud

Initially, Holck and Umbrell vigorously dispute this Court's prior interpretation of the crime of honest services fraud contained in the Court's Memorandum of October 29, 2004, 2004 WL 2612017. The Third Circuit not having issued any decisions on honest services mail fraud since that Memorandum, the Court will stand by its interpretation and apply it to the facts which were proved at trial, viewed in the light most favorable to the government. In summary, the Court finds that the evidence is sufficient under the first prong of honest services fraud, a quid pro quo bribery scheme, but insufficient under the second prong of honest services mail fraud, the so called conflict of interest prong.

Holck was President of Commerce Bank/Pennsylvania ("Commerce") and Umbrell was a Regional Vice President of the bank. Commerce had enlisted the services of Ronald White, Esquire, ("White"), originally a defendant in this case until his death prior to trial, to assist Commerce in obtaining business in the City of Philadelphia, which the indictment did not allege was unlawful, and the Court specifically charged the jury was lawful. *See* N.T. 4/7/05, at 252.

The evidence showed that Holck and Umbrell, on behalf of Commerce, aggressively sought increased business with the City of Philadelphia. Defendant Cory Kemp, ("Kemp"), as City Treasurer, had significant influence as to the placement of bank deposits. Commerce was also interested in making loans to, and increasing deposits by, the city or city-related entities.

The government's theory against Holck and Umbrell was that they used their lawful relationship with Ronald White to gain influence with Kemp, and gave Kemp significant and favorable loans, which deviated from the normal Commerce standards, both procedural and susbstantive standards, and were based on unusually and unwarrantedly generous credit standards; in return, Kemp gave preferential treatment to Commerce in getting city business in exchange for the benefits which Kemp received from White, Holck and Umbrell.

Holck and Umbrell, through their highly able counsel, aggressively contested the government's evidence at trial, and vigorously cross examined government witnesses in an attempt to rebut the government's arguments so that the jury would find that their clients had acted as rational, honest bankers in acting in the interest of their employer, Commerce, and had not joined the alleged conspiracy. Holck and Umbrell did not present any evidence. After carefully listening to approximately 27 days of testimony, including a large number of recorded conversations in which the vocal intonations and expressions may have made a distinct impression on the jury, plus four days of arguments, and after lengthy deliberations, the jury convicted Holck and Umbrell of conspiracy as charged in Count 1, and two counts of aiding and abetting honest services mail fraud, Count 19 relating to honest services wire fraud arising out of a January 29, 2003 e-mail from Holck to Commerce CEO Vernon Hill ("Hill") regarding city deposit accounts, Ex. 1058; and Count 21, honest services wire fraud arising out of a May 28, 2003 telephone call between White and Holck, Ex. 194. The jury acquitted Holck and Umbrell on several counts of aiding and abetting honest services wire fraud, and was unable to reach a verdict on several other counts.

The Court has reviewed the testimony at trial and the voluminous post-trial briefing submitted by Holck and Umbrell and the government, and has concluded that it would be legal error to overturn the jury's verdict. Although the evidence as to Holck and Umbrell is largely circumstantial, there is sufficient evidence in the record to sustain the verdict.

### B. *Factual Summary*

This Memorandum will merely summarize the voluminous evidence at trial. The government's evidence against Holck and Umbrell showed that they, often acting together, but sometimes separately, had made a conscious decision to give to Kemp, either personally or to other persons or entities for which he requested loans, a series of favorable loans and to ask for, and receive in return, preferential treatment from Kemp in awarding city-related business to Commerce. Some of these loans were made directly to Kemp, and some were made at Kemp's request to either Kemp's relatives or a church in which Kemp was active.

Kemp became the City Treasurer in April 2002. Shortly thereafter, on May 13, 2002, several Commerce executives arranged to meet with Kemp to promote additional business for Commerce, and reported on this meeting to Commerce's CEO Hill, in one of a series of regular reports called "Monday morning update" in which Umbrell states "Kemp is relatively new and we can position ourselves as a consultant to him." See Ex. 1026. White also helped Commerce set up a meeting with Kemp in early 2003. See Ex. 1058, which is also the subject of Count 19, see below. After this meeting, Holck reported to Hill that Kemp was favorable in increasing city business for Commerce. See Ex. 1126.

The first loan which the evidence showed that Commerce made at Kemp's request was to Paul Schnapp, related to Kemp by marriage, and also a close personal friend. This occurred shortly after the initial May 13, 2002 meeting referred to above. Several days after this meeting, Umbrell approved a $10,000 unsecured loan to Schnapp and his wife. See Ex. 1143(a)(b)(c). Because Schnapp had previously declared bankruptcy, the jury could have found from the speedy processing of this loan and the overall circumstances, it was made with the intent to secure favor

with Kemp. In contrast to the favorable treatment which Umbrell gave Schnapp at Kemp's request, some months subsequent, in July 2003, Schapp tried unsuccessfully on his own to get additional funds from Commerce, but then complained to Kemp that Umbrell wanted additional co-signers. Kemp refused to help Schnapp at that time, and without any request from Kemp, Umbrell refused to grant Schnapp's request.

The government relied heavily at trial on two personal mortgage loans which Holck and Umbrell extended to Kemp to buy a $225,000 house in late 2002 near Reading, Pennsylvania for 100% financing, i.e., with no money down. There was extensive evidence at trial about the processing of these loans and the evidence allowed the jury to find that Holck and Umbrell had purposely bypassed normal Commerce procedures and credit standards in approving this loan to Kemp. In contrast, a year previously, before Kemp had become Treasurer, his request for a $2,000 line of credit had been rejected by Commerce because of his credit history. *See* Exs. 1098, 1099.

Concerning the first mortgage loan, the evidence allowed the jury to conclude that Umbrell, working together with Holck, had approved this mortgage before Kemp had even completed a loan application; as to both the first loan, for 80% of the value, and the second loan, for the remaining 20% of the value, Holck and Umbrell bypassed standard Commerce Bank procedures as to which numerous other witnesses from Commerce testified at trial, for a 100% financing loan, which was unwarranted with Kemp's credit and financial background. The jury could have concluded that Holck and Umbrell went out of their way to make a highly favorable loan to Kemp that would not have been made in ordinary circumstances to a bank customer, without Kemp's power to give City of Philadelphia business to Commerce.

To be sure, Holck and Umbrell had an answer at trial for all of these contentions and virtually every piece of evidence. Commerce Bank employees who testified for the government were skillfully and vigorously cross-examined. On cross-examination, in many instances, they qualified or conditioned and at times even contradicted the testimony they had given on direct examination. Holck and Umbrell's briefs cite to this selected testimony as showing that Kemp did not receive favorable treatment, but the entire evidence allowed the jury to find otherwise, and the Court must consider the evidence in the light that is favorable to the government.

As one example of Holck's and Umbrell's personal involvement in favoring Kemp with a mortgage, on December 11, 2002 they signed a document waiving all the conditions which lowerranking Commerce employees had recommended for this loan, *see* Ex. 1084(g), without any explanation, contrary to bank policy. *See* Ex. 1077. The government also points out that although Umbrell had authority to approve this mortgage himself, he sought Holck's approval and the jury could infer he acted so as to seek the cover of his superior in approving this mortgage.

When the Commerce department handling the second mortgage loan for the remaining 20% of the price of the home (not covered by the first mortgage), Umbrell further acted to bypass the usual Commerce policies, and approved the loan. *See* Ex. 1084(n). On a form requiring an explanation for exceptions to the Commerce policy, Umbrell noted that Kemp was "Treasurer of the City of Philadelphia" and also cited his "strong bank relationship" and his "suff[icient] income." The jury could have found that Kemp's personal bank relationship was minimal.

His income, with his other expenses, was probably "sufficient." The jury could have found that 100% financing was granted under unusual circumstances due to Kemp's position. Umbrell wrote in another responsive e-mail dated December 19, 2002 about this loan and possible delays, Ex. 1086, that "we need to make this happen."

Overall, in the context of the bribery prong of honest services fraud, the evidence would allow the jury to find from the circumstances that the mortgage loans for 100% financing were a substantial favor given to Kemp. Two Commerce loan officers, Charles Creager and Thomas Conte, testified to specific facts that would allow the jury to find that Holck and Umbrell had not followed Commerce's stated policies in granting this loan, both as to procedure and substance. Whether it would be the "quid" part of a "quid pro quo" was a jury question, but the overall evidence allowed this inference.

In March 2003, Umbrell was also involved in approving a $21,300 automobile loan to Kemp, and the jury could have found that if Commerce had followed its standard automobile loan policies, the loan to Kemp would not have been made. In fact, the loan was for a greater amount than the cost of the car, and Kemp received $2,200 as "cash out" proceeds from this loan, which helped him meet his obligations on the home mortgage from Commerce.

In June 2003, Commerce made a $480,000 construction loan to Kemp's church in Reading, Pennsylvania at Kemp's request. Umbrell waived the $3,500 appraisal fee and allowed for an immediate payout of $120,000 of the loan for alleged prior expenses.[1]

In one of the recorded conversations between Kemp and Umbrell on June 23, 2003, Ex. 303, Kemp and Umbrell discussed the renewal of some of the city's certificates of deposit with Commerce, in the very same conversation where Umbrell agreed that he would waive the $3,500 appraisal fee for the church loan. At the end of the call, Kemp tells Umbrell "so you get special treatment." The government is correct, in its brief, p. 32, that the jury could find this conversation was an explicit quid pro quo, supporting the first prong of the honest services scheme. On the same day, Holck was requested to, and did, give his approval to these arrangements. The jury could have found that Holck being involved in this transaction was unusual and unnecessary, but was, with the other facts reviewed, evidence that Holck and Umbrell joined the conspiracy, which the Court has previously found the evidence sufficient to conclude that White and Kemp had formed.[2]

Shortly after the church loan, Umbrell wrote in a Monday morning update to Commerce's CEO Hill on July 7, 2003, Ex. 1042, about the $480,000 commercial mort-

---

1. In a separate fraud, Kemp and the church pastor, Francis McCracken, provided fraudulent invoices to Commerce in support of the advance and embezzled some of the funds for their own personal gain. There is no evidence that Holck and Umbrell had any knowledge of this.

2. During the trial, in ruling on a motion under F.R.E. 104, the Court found that White and Kemp had conspired as charged in the indictment. Under the principles stated in

many Third Circuit cases, such as *United States v. Boyd*, 595 F.2d 120 (3d Cir.1978), the question as to whether other defendants joined in an existing conspiracy is a factual inquiry. As stated in *Boyd*, 595 F.2d at 123, "and even if a small group of co-conspirators are at the heart of an unlawful agreement, others who knowingly participate with the core members and others to achieve a common goal may be members of a single conspiracy."

gage to Kemp's church noting that after the closing, he had hosted Kemp and his wife at a Phillies game, and then stated "Kemp indicated that he will move the pending cash management review for the city this month. I updated Ron White accordingly."

Umbrell made further advances to Kemp's church despite the absence of bona fide invoices supporting the advances. Ex. 1097.

Another loan was made in July 2003 by Umbrell in the amount of $7,500 to Kemp's brother-in-law, Eric Flores, as a favor to Kemp. A phone call between Umbrell and Kemp, Ex. 342, allowed the jury to find that this loan was part of a stream of favors from Commerce to Kemp.

The above series of loans were inferentially contrary to Commerce's economic self interest in maximizing its profits, and the jury may have concluded that Holck and Umbrell approved these loans to curry favor with Kemp, with the expectation of receiving business in return, because the loans would not have been made but for Kemp's official position as City Treasurer. There does not appear to be any other rational reason for Commerce to grant so many constant and consistent favors to a public official.

In an effort to show Kemp taking action to benefit Commerce as a return of these favors, the government introduced substantial evidence about one significant transaction involving the city's anti-blight Neighborhood Transformation Initiative ("NTI") and a line of credit that was being sought from banks by the city's Redevelopment Authority to fund the NTI program in May 2003.

The city, acting through a public finance agent, sought bids from interested banks for the line of credit, and the evidence indicated that the interest rate which the bank would charge for the line of credit was the most important piece of information. There was a great deal of testimony on this topic including from Janice Davis, the former City Finance Director, Kathy Clupper, the city's financial advisor on the NTI transaction, and representatives of other competing banks, in addition to numerous recorded conversations. The Court will not summarize all of these in this Memorandum, but the jury could find, from a series of conversations between May 28 and June 11, 2003, involving White, Kemp, Holck and Umbrell, that Kemp clearly was attempting to make sure that Commerce got this business and, with White's encouragement, was anxious to give Commerce non-public confidential information about the bids of other banks so that Commerce would be able to submit the lowest possible bid. Although there was no testimony that Holck or Umbrell received anything of value personally for this transaction, or that the interest rate was necessarily profitable, the jury could find that Commerce very much wanted this line of credit, not so much from the interest that it would receive, but more importantly, because of additional city deposits that it anticipated would result from making this loan, and this would be seen by Commerce as a significant piece of business secured by Holck and Umbrell.

The government also introduced evidence that after a first round of bids for the NTI line of credit, it came to the attention of City Finance Director Janice Davis that Kemp had given Commerce confidential competitive information not available to the other banks seeking this business. Davis thereupon ordered a second round of bids, but Kemp took actions to make sure, even on this second round, that Commerce would have the inside track. *See* Exs. 182–251, 1104, 1114, 1204, 1226. As a result, KBC, Commerce's closest competitor, declined to participate in

the second bid. N.T. 3/29/05, at 74, Ex. 1226. Holck and Umbrell, often in conversation with White as much as with Kemp, clearly exhibited, in these phone calls, knowledge that Kemp was giving confidential information only to them, and they appreciated it, and acted on it in formulating their own bid. Recognizing the inappropriateness of these communications, Holck at one point told White "something's not smelling right." Ex. 219.

In considering all of the evidence, and in particular after listening to the recorded conversations during many trial days, the Court concludes the jury was entitled to find that Holck and Umbrell eagerly received the confidential information, had reason to know that it was non-public and confidential, and they acted on it, and that Kemp had taken specific steps to make sure Commerce would win this business in return for the benefits Kemp had received from Holck and Umbrell.

### C. *Legal Discussion*

Given all of the benefits reviewed above which Commerce had directed to Kemp personally, or to others at Kemp's request, the jury was entitled to find that Kemp was returning those favors, i.e., he had received the "quid" and by insuring that Commerce would win the NTI line of credit, he supplied the "quo"—and this satisfies the requirements of bribery under the first prong of honest services fraud. In *Evans v. United States,* 504 U.S. 255, 268, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992), the court held that bribery requires proof of a quid pro quo where "a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."

### 1. *Bank Loans as a Component of Bribery*

The government contends that a stream of benefits to a public official, in implicit exchange for one or more official acts, can constitute a bribery, even if the stream of favors is loans, *citing United States v. Holzer,* 816 F.2d 304 (7th Cir.1989).

There is significant factual difference between *Holzer* and the instant case. In *Holzer,* a judge received numerous bribes over a long period of time. These bribes were "dressed up" in the form of either 1) outright cash gifts nominally disguised as "loans" but without recourse or repayment or 2) loans that were commercially unreasonable under any possible interpretation. *See, e.g., Holzer,* 816 F.2d at 308 ("When he asks them for help, either they lend their own money directly to him or, as if by magic, bank loans that he had tried and failed to get suddenly materialize."). The nature of these transactions led the *Holzer* Court to conclude that:

> It is doubtful that these transactions should be called "loans." Out of some $200,000 in documented receipts from these sources, Holzer repaid almost nothing; and the evidence supports an inference that he never intended to repay the money in full, realizing that the lawyers and guarantors of the loans would never press him for repayment, because they would fear retribution ... Most of the loans, indeed, seem to have been thinly disguised bribes. Several listed on a private record that Holzer kept of his personal debts were crossed out—without having been repaid.

*Id.* (emphasis added). In short, the "loans" provided to Holzer were essentially unsecured gifts with little or no expectation of repayment. This scenario differs from the instant case, where the relevant "loans" were actual commercial loans with real expectation of repayment. Here, it is not "doubtful" that the loans provided to Kemp and others were true "loans"—they were indeed real loans, and, as such, it is

not clear that they fall within *Holzer's* precise rhetorical sweep.[3]

█ In support of loans being an appropriate vehicle for a stream of favors, the government introduced sufficient evidence to show, as noted above, that the loans to Kemp, as well as the loans made at Kemp's request, were either unusually favorable given the credit histories of the recipients and/or were made in derogation of normal Commerce procedures and standards. As a matter of common sense, the jury could have found that giving favorable loans was a form of gratuity, i.e., the recipient (i.e. Kemp) was able, because of his official position, to get loans that another similarly situated private citizen would not have obtained. These loans allowed Kemp to purchase a desirable home and car. As noted in *United States v. Woodward,* 149 F.3d 46, 55 (1st Cir.1998), upholding a conviction, "a person with continuing and long term interest before an official might engage in a pattern of repeated intentional gratuity offenses in order to coax ongoing favorable action in derogation of a public's right to impartial official services."

Other cases stand for the proposition that favorable loans are sufficient to sustain a conviction under the bribery statute.

First, in *United States v. Williams,* 705 F.2d 603 (2d Cir.1983), the Second Circuit affirmed numerous convictions of former Senator Harrison A. Williams of New Jersey as part of the high-profile ABSCAM prosecution. In this complicated case, the indictment alleged a conspiracy and eight substantive violations arising out of Williams' conduct in promising to use his position as a U.S. Senator to help obtain government contracts for the purchase of titanium from a mining venture in which he held an interest. The promises were alleged to have been made in connection with two transactions, the first of which was a proposed *loan* of $100 million, ostensibly to have been financed by a fictitious entity known as Abdul Enterprises, Ltd. Importantly, *"the loan was to be repaid with interest ... Therefore, its value to the defendants was not the amount of the loan, but rather the profits they anticipated making as a result of securing financing for their venture ... the agents did not offer to assure any particular level of profits in connection with the proposed loan." Williams,* 705 F.2d at 620 (emphasis added). For this particular loan transaction, the indictment charged Williams under the bribery statute (18 U.S.C. § 201(c)). *See id.* at 607 n. 2 ("Counts Two through Four alleged that Senator Williams sought and agreed to receive a loan of money for a business enterprise in which he had an interest.").[4] On the basis of this proposed favorable loan transaction, the jury convicted Williams of particular bribery charges. On appeal, the Second Circuit affirmed, finding the evidence on that charge sufficient and suggesting no reason to find that the provision of a favorable loan, as opposed to an outright cash gratuity (as had been present in other ABSCAM prosecutions involving outright cash payments) removed that "gift" from the realm of bribery.

---

3. *Holzer* was vacated in light of *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), but it is still cited with approval by the Third Circuit. *See United States v. Panarella,* 277 F.3d 678, 695–96, (3d Cir.2002), and *United States v. Antico,* 275 F.3d 245, 263–64 (3d Cir.2001), as to the elements of the conflict of interest prong of honest services fraud.

4. In a manner similar to the instant case, *Williams* involved recorded conversations in which the defendant or other members of the conspiracy met with the [fictitious] lenders to, the jury could infer, persuade them that the Senator's influence justified making the loans. *Williams,* 705 F.2d at 609–610.

While the prosecution in *Williams* involved only the bribe recipient (*i.e.*, the fictitious party offering the loan was comprised of federal agents), if receipt of a favorable loan could be considered receipt of enough of a gift to sustain a conviction under the bribery statute, then giving an unusually favorable loan could likewise inculpate a "lender." And in this case there was a series of such loans.

Second, in a more recent public corruption case, *United States v. Serpico*, 320 F.3d 691 (7th Cir.2003), *r'hg denied*, 2003 U.S.App. LEXIS 7307 (7th Cir.2003), several defendants were charged with racketeering, mail fraud, and bank fraud for a variety of transactions including a personal "loans-for-deposits" scheme, in which the defendant union officials "deposited large sums of union money in various banks. In exchange, the two received *overly generous terms and conditions on personal loans* totaling more than $ 5 million." *Serpico*, 320 F.3d at 694 (emphasis added). The jury convicted two of the defendants on mail fraud charges specifically relating to the personal loans-for-deposits scheme.[5] The Court opined:

> The loans-for-deposits scheme shows even more dramatically that a bank can take on higher risk while acting in what it believes to be its own best interests ... Capitol Bank ... [ ] decided the benefits from the deposits made it worth the risk of loss resulting from the generous terms and conditions of the loans it gave Serpico. But the fact remained that the bank made risky loans at low interest rates that it never would have made absent the scheme.

*Id.* at 695. With regard to sentencing, the district court had calculated the defendants' sentences under Sentencing Guidelines § 2F1.1 (the fraud guideline), but the government argued on appeal that the Court should have applied § 2E5.1 (the benefit plan bribery guideline). Noting that the Guidelines "encourage[ ] the district court to find an appropriate guideline section to fit the conduct (not just the charge)," the Seventh Circuit agreed, and remanded for resentencing under § 2E5.1 because "the loans-for-deposits scheme *was basic bribery*, with [defendant] promising union deposits to the banks *in exchange for favorable personal loans." Id.* at 697 (emphasis added).

While the scenarios involved in these cases do not necessarily parallel the instant case,[6] in both cases particular defendants were convicted of either 1) bribery or 2) fraud on a bribery theory, based specifically on the provision of certain favorable purely-personal or personal-business loans. As such, both provide support for the principle that the provision of favorable loans is sufficient "quid" to sustain a conviction under the bribery statute.

The Court concludes that a holding that a loan could not, as a matter of law, constitute a gratuity, or be part of a quid pro quo bribery scheme, would simply open the floodgates for banks and other financial institutions to allow unscrupulous employees to simply use the vehicle of loans to give otherwise prohibited gratuities to public officials—a surely unnecessary and unwise legal conclusion.

---

**5.** For sentencing purposes, the court found the damage to the unions to be equal to the additional amount of interest the union assets would have earned had the defendants purchased CDs at banks offering the highest interest rates instead of those offering him special deals on his personal loans.

**6.** *E.g.*, both of these cases involved a much more clear *quid pro quo*—namely, the parties making the loans received or expected to receive very specific, identified benefits in return for loans.

Although Holck and Umbrell vigorously argued at trial that their actions with regard to the NTI line of credit were nothing unusual, let alone conspiratorial, the opening brief filed by Holck and Umbrell, as well as the reply brief, are not fair statements of the overall evidence introduced at trial, particularly on the NTI line of credit transaction. The defense letter brief of September 21, 2005 does contain, in its attachments, the relevant recorded conversations on the NTI line of credit, and the letter brief itself, although acknowledging that the jury could have drawn certain inferences about Kemp's actions, nonetheless refuses to acknowledge reasonable inferences which the jury could have drawn about the conduct, motive and intent of Holck and Umbrell. Furthermore, the letter brief treats each of these conversations as a "stand alone" transaction and refuses to draw any lines between them. When those "dots" are connected, and all of the conversations and other evidence are considered as a whole, it is clear that the jury had sufficient evidence with which to convict Holck and Umbrell, and the jury's guilty verdict should not be overturned. For this Court to adopt Holck and Umbrell's interpretation of these various conversations would run counter to the holding in *Continental Ore v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 691, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) (courts must avoid "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.").

## 2. *Temporal Attenuation between the Quid and the Quo*

Prior to oral argument, The Court asked counsel for legal authority concerning whether the alleged quid and the quo in this case were sufficiently close together in time (or, stated differently, whether (and to what degree) temporal attenuation between the quid and the quo raises a legal problem).

In response, defendants cited to *United States v. Sun–Diamond Growers of California*, 526 U.S. 398, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999) and *United States v. Schaffer*, 183 F.3d 833 (D.C.Cir.1999) for the principle that the law requires a "temporal nexus" between the alleged thing of value given to Kemp and the official act performed or to be performed in return. However, neither of these cases require a conclusion of temporal attenuation which warrants granting defendants' motions.

In *Sun–Diamond Growers*, the Supreme Court merely held that, "in order to establish a violation of 18 U.S.C. § 201(c)(1)(A), the Government must prove a link between a thing of value conferred upon a public official and a specific 'official act' because of which it was given." *Sun–Diamond Growers*, 526 U.S. at 414, 119 S.Ct. 1402. This holding is limited to the principle that there must be some identified connection between the defendant's intent and a specific official act; however, *Sun–Diamond Growers* does *not* discuss the detailed contours of this requirement nor set forth any temporal boundaries—it only required that a "particular official act be identified and proved." *Id.* at 406, 119 S.Ct. 1402.

Having the benefit of *Sun–Diamond Growers*, the D.C. Circuit thereafter handed down its opinion in *Schaffer*. The factual predicate in *Schaffer* is straightforward. Schaffer, a Tyson Foods executive, gave Secretary of Agriculture Mike Espy several $1,500 tickets (purchased by Tyson) to a presidential inaugural dinner. The tickets had been purchased well prior to January 18, 1993 (the day Espy was given and used the tickets at the dinner). This specific date is important because the Department of Agriculture did not become aware of an *E coli* outbreak due to bad

hamburger meat until that very day, and the specific official acts that the government charged Espy at trial with performing (*i.e.*, as the object of the gratuity) were revisions to two official USDA policies (a revised zero tolerance policy and safe handling labels) that related/responded directly to that particular *E coli* outbreak.

Schaffer was convicted for providing the tickets to Espy as an illegal gratuity. The District Court, however, granted a post-trial judgment of acquittal.[7] In reaching this decision, the District Court took the *Sun–Diamond Growers'* requirement of a link between gifts and an intent to influence specific official acts of the recipient as its point of departure, and then examined the nexus between the revised USDA policies and the tickets given to Espy to determine if it was strong enough to sustain a finding of intent to influence an official act under the gratuity statute. The District Court concluded that because "there was no evidence that Mr. Schaffer or anybody in Tyson Foods knew or anticipated anything about zero tolerance or mandatory safe handling labels at the time of the inaugural dinner," the "quo" was "disqualified for temporal reasons." *See Schaffer,* 183 F.3d at 839.

On appeal, the D.C. Circuit began its analysis by noting that, although *Sun–Diamond Growers* had established a required "link," after that case "the magnitude of the necessary link, and its proper translation into a concrete rule of decision, remains in some doubt." *Id.* at 840.[8] The Court then engaged in its own review of this question. After having established two latent official actions of interest to Tyson Foods—*i.e.,* revisions to the USDA's zero tolerance and safe handling label policies—the Court held that if a trier of fact could find that Schaffer had provided the tickets to Espy, "we then ask whether a rational jury could additionally have determined that the thing of value was provided with the requisite statutory intent to influence Espy in has actions with regard to [the zero tolerance and safe handling label] policies." *Id.* at 842. In answering this question, the Court first offered this statement:

> When faced with competing explanations for some specific conduct, conduct which could be either innocuous or illicit depending upon the particular motivation involved, the inquiry will rarely be clean or neat. Both common sense and practical experience, each of which we ascribe to the jury, instruct that human beings rarely act for a single purpose alone. Rather, activity is more typically multi-causal, and directed towards achieving several rather than a single ends. Accordingly, we do not view the question of intent in the Manichean terms of the prosecution and the defense, *focusing instead upon the more realistic and probative question of whether the acts in question were substantially, or in large part motivated by the requisite intent to influence* [Espy]. As a final caveat, we note that as with most cases in which the defendant's state of mind is at issue, it may be near impossible to establish the requisite mens rea through direct evidence. In the absence of any specific statement or other contemporaneous documentation

---

7. The court set aside the verdict on the grounds that the jury had been presented insufficient evidence to support a verdict of guilt. *See United States v. Williams,* 29 F.Supp.2d 1 (D.D.C.1998).

8. The Court attributed this to the fact that the Supreme Court "faced a narrow question and provided an equally circumscribed answer," and thus "felt no need to explore the degree of proof necessary to show the link or how the government might go about establishing its presence." *Schaffer,* 183 F.3d at 840–41.

of the defendant's subjective motivation, *the trier of fact can do not more than ascribe an intent on the basis of the circumstances surrounding the defendant's actions.*

*Id.* at 843 (emphasis added).

After examining the evidence of the timing surrounding the *E coli* outbreak and the awareness of that outbreak by both the Tyson executives and the USDA, the Court found that there was insufficient evidence from which the "jury could infer that Schaffer and Tyson Foods were aware of the USDA's intent to act on the relevant issue at the time of the inaugural dinner." *Id.* at 844 n. 11. Once the Court removed the *E coli* outbreak from the picture, all that remained "was an awareness by a regulated entity that the USDA had been developing a new pathogen control policy." *Id.* As such, the Court concluded:

> In our opinion, the inferential leap across the chasm separating this premise from the requisite conclusion—that the tickets were intended, beyond a reasonable doubt, to induce Espy to propose, take, or shy away from some action on zero tolerance, or alternatively to ensure that Tyson Foods' proposals, suggestions and/or concerns were accorded special scrutiny—cannot be considered reasonable. The breadth of the Supreme Court's *Sun–Diamond* opinion with respect to identifying a particular official act must of necessity spill over here, creating the need for a more definitive link than the prosecution provided. To hold otherwise would mean that any time a regulated entity became aware of any inchoate government proposal that could affect its interests, and subsequently provided something of value to a relevant official, it could be held to violate the gratuity statute in the event the

inchoate proposal later appeared in a more concretized form.

*Id.* at 845. On this basis, the Court affirmed.

On the surface, it might appear that *Schaffer* provides some persuasive authority for Holck and Umbrell's temporal attenuation argument. However, there are two main reasons why this Court does not take it as such.

First, as the D.C. Circuit recognized, the U.S. Supreme Court has clearly left the magnitude of the necessary link "in doubt." *Schaffer* is a D.C. Circuit opinion, which is obviously not binding in the courts of the Third Circuit. Moreover, research indicates that no other courts (including the Third Circuit) have cited to *Schaffer* for a specific principle related to "temporal attenuation;" nor have any courts generally opined on an appropriate temporal benchmark. As such, *Schaffer* is not only inapposite on the facts, it stands on its own in the legal landscape, and is far from "established" law that would control here.

Second, and perhaps more important, a more nuanced reading of *Schaffer* than that offered by counsel for Holck and Umbrell suggests that *Schaffer* is better understood as a case about the *knowledge*—rather than the mere time frame—required to establish the required link. Schaffer was acquitted of the gratuity charges not simply because there was a long period of time between the gifts and the USDA's policy revisions, but, rather, because of a finding that there was no evidence that Schaffer *knew or anticipated anything* about those policy revisions (or any other decisions affecting Tyson within Espy's purview) at the time of the gift giving. *See Schaffer,* 183 F.3d at 833.[9] If

---

9. Notably, the District Court's use of the phrase "disqualification for temporal rea-sons" was not repeated in the D.C. Circuit's opinion.

evidence had demonstrated that Schaffer had actually *known* about the potential USDA policy revisions, nothing in *Schaffer* says that the D.C. Circuit would have refused to affirm the jury's verdict merely because of significant temporal attenuation between the gifts and the actual policy revisions. Knowledge may *or may not* be a product of temporal attenuation (*i.e.*, one could easily conceive of a situation where a lack of knowledge was due to something other than an issue of timing). The factual scenario in *Schaffer* happened to involve a question of knowledge that hinged on the timing of an outside event, but a case could just as easily turn on something else.

■ Even if *Schaffer* applied here, the appropriate question under conspiracy and bribery jurisprudence is not whether the favorable loans and Kemp's official actions were greatly attenuated in time, but, rather, whether Holck and Umbrell knew or anticipated anything when they made the favorable loans with regard to future acts of Kemp (*e.g.*, the NTI line of credit), or did Kemp's actions regarding the NTI line of credit evidence a payback as consideration for their having made the loans. The actions of Holck and Umbrell were not so temporally attenuated that the jury could not find their conduct with regard to both the loans and the NTI line of credit evidenced the scheme to corrupt Kemp.[10]

### 3. *Other Arguments by Holck and Umbrell Re: Conspiracy Law*

■ Some other arguments by Holck and Umbrell must be considered and are rejected. First, they have insisted, from the very beginning, that not only the indictment, but now, after the trial, the evidence shows that there were multiple conspiracies and the Court, having charged

the jury on a single conspiracy, committed error. As indicated in the Court's prior Memorandum of October 29, the government tried this case on a single conspiracy theory, and the Court charged the jury on a single conspiracy. The issue of whether the government has proved a single or multiple conspiracies is a factual one for the jury. *United States v. Perez*, 280 F.3d 318, 345 (3d Cir.2002). *See, also, United States v. Boyd*, 595 F.2d at 120, 123 (3rd Cir.1978):

> It follows from these basic principles that the government, without committing a variance between a single conspiracy charged in an indictment and its proof at trial, may establish the existence of a continuing core conspiracy which attracts different members at different times and which involves different sub-groups committing acts in furtherance of the overall plan.

The Court cannot say, as a matter of law, that the evidence only proved multiple conspiracies. The evidence has shown that the conspiracy charged was to corrupt Kemp, and the government introduced sufficient evidence for the jury to find that Holck and Umbrell had joined this conspiracy by their conduct reviewed above. It is true that other alleged co-conspirators, such as Janice Knight, as to whom the jury could not reach a verdict on conspiracy, and Le–Van Hawkins, who was acquitted of conspiracy, were involved in other acts, different from Holck and Umbrell, but this fact does not itself negate the existence of a single conspiracy.

Furthermore, Ronald White, whose actions were interconnected with Knight and Hawkins, also interacted with Holck and Umbrell, most significantly in connection

---

**10.** This is clearly a determination in the hands of the jury as trier of fact, and, per *Schaffer*, the jury may properly be guided by circumstantial evidence in reaching an answer. *Id.* at 843.

with the NTI line of credit. In fact, considering all of the recorded conversations related to the NTI line of credit, White facilitated Holck and Umbrell's use of Kemp to get confidential information that assisted Commerce in winning this piece of business.

Holck and Umbrell also insisted that the government was trying this case on a so called "hub and spoke" type of conspiracy, *see Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and using this concept, they argue the conclusion must be drawn that either Holck and Umbrell were not co-conspirators, or that the single conspiracy theory was fundamentally flawed, or that only multiple conspiracies were proven, and since they were not charged, Holck and Umbrell must be acquitted or at least receive a new trial. The government has consistently denied that it was proceeding under a "hub and spoke" theory and Holck and Umbrell have not pointed to any Third Circuit case law that would require the Court to proceed down that line of analysis.

### 4. *"Conflict of Interest" Prong*

■ As to Holck and Umbrell's argument that the evidence was insufficient to prove their guilt under the second prong of the Third Circuit's honest services fraud jurisprudence, the Court agrees. There is no evidence on the record that Holck and Umbrell had any knowledge that Kemp had any reporting requirements and that he had to report, to the city or state, any of the favors that he had received from Commerce.

There is even some issue as to whether the loans Kemp received were reportable. The jury could infer that Holck and Umbrell knew that because Kemp favored Commerce, after receiving favors from Commerce, that Kemp had a conflict of interest. The Court finds that such knowledge, in and of itself, although part of the Third Circuit's jurisprudence of proving the conflict of interest prong, is insufficient to prove that Holck and Umbrell knew that Kemp was not reporting these favors.

The government, in an effort to justify the sufficiency of evidence on a second prong argues that a jury could readily infer such knowledge, first, because of the legal maxim that ignorance of the law is no excuse, but secondly, because Holck and Umbrell engaged in a grossly inappropriate course of conduct with five different loans, over a period of one year, to three different individuals and a church; and because there was no publicity or inquiry regarding these loans, the jury could have found that Holck and Umbrell must have known that Kemp had not made any disclosure, or that they had agreed that no disclosure would occur. The Court finds that there is simply no evidence on the record that would warrant such an inference. Although it is true that ignorance of law is no excuse, this concept only applies to someone who has a duty to act, or in this case, to Kemp. Holck and Umbrell are charged with crimes requiring a mental state of intent. The government had the obligation of proving their knowledge beyond a reasonable doubt, but cannot rely on a vicarious theory of responsibility under the well worn dictum that "ignorance of the law is no excuse" to satisfy its burden that Holck and Umbrell had knowledge of Kemp's reporting obligation. Even if there had been some publicity about Kemp's unreported receipt of these loans, there is no assurance that it would have reached the eyes or ears of Holck and Umbrell.

Because of this conclusion, the Court must consider the impact of *United States v. Syme*, 276 F.3d 131 (3d Cir.2002), which relied on *Griffin v. United States*, 502 U.S.

46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). Holck and Umbrell argue that this case requires an acquittal or at least a new trial, because once evidence is insufficient on one of two theories, then the entire conviction must be overturned. The Court disagrees, and finds that the defense argument would only apply if one of the two theories is either unconstitutional or *legally* invalid. However, when, as here, the government proceeds on two alternative theories in one count, and the only issue is the sufficiency of the evidence, if the evidence is sufficient on one of theories, then *Syme* holds the verdict should stand.

### D. *Mail Fraud*

■ In addition to the conviction on Count 1 charging conspiracy, both Holck and Umbrell were found guilty on Count 19, aiding and abetting honest services wire fraud arising out of a January 29, 2003 e-mail from Holck to Commerce CEO Vernon Hill which states "it's time to move full speed on city accounts," and notes the meeting with Kemp is scheduled for February 5. Ex. 1058, and Count 21, aiding and abetting honest services wire fraud arising out of a May 28, 2003 telephone call between White and Holck, Ex. 194. This call concerned the NTI line of credit in which White repeated advice he had given Umbrell that in the second bid, they should not make their bid first, which was an implicit confirmation of an understanding that Kemp would advise Holck and Umbrell of other bids so that the Commerce bid would be the lowest. The jury could have readily found from the government's evidence that this was bid-rigging and sufficient to support the convictions of mail fraud.

Both of the counts on which Holck and Umbrell were convicted on are based on evidence sufficient to allow the jury to find that the wire communications were part of the effort of Holck and Umbrell to corrupt City Treasurer Kemp by providing him with otherwise unavailable loans in exchange for city business. Holck and Umbrell do not seriously assert insufficiency of the evidence on these mail fraud counts once the evidence is deemed sufficient on the conspiracy count.

Nonetheless, an alternative holding in *United States v. Dobson,* 419 F.3d 231 (3d Cir.2005) supports the conviction. The defendant in *Dobson* asserted that the evidence was not sufficient to allow a jury to find her guilty of mail fraud, notwithstanding the many misrepresentations, if not outright lies the defendant made to punitive customers at the various trade shows where she was selling franchise arrangements for $5,000—and the court held that a jury could properly convict her under this evidence. The same holding is true as to Holck and Umbrell under the facts of this case.

### II. *Denial of Motion for New Trial*

### A. *The Fact that Holck and Umbrell Were Convicted of Conspiracy Is an Additional Reason Why They Are Not Entitled to a New Trial Under Dobson*

Three issues raised by Holck and Umbrell are also raised by all defendants who went to trial and found insufficient in the Court's Memorandum in *United States v. Kemp,* 379 F.Supp.2d 690, relating to the jury voir dire, selection of trial date, and excuse of juror no. 11. In addition, in the U.S. v. Hawkins Memorandum, the Court denied relief to co-defendant LaVan Hawkins based on the Third Circuit's recent decision in *United States v. Dobson,* 419 F.3d 231 (3d Cir.2005). However, because Holck and Umbrell were convicted of conspiracy, whereas Hawkins was acquitted of conspiracy, the Court discerns an additional reason why Holck and Umbrell are not

entitled to any relief under *Dobson.* The following discussion assumes familiarity with the decision rejecting a new trial for co-defendant LaVan Hawkins, *see* Memorandum dated September 28, 2005.

On the charge of conspiracy, the Court instructed the jury as follows:

> The government must prove that a defendant had knowledge of the illegal objective contemplated by the conspiracy.... The defendant knew of the purpose of the conspiracy and deliberately joined in it.

(N.T. 4/7/05, p. 24).

\* \* \* \* \* \*

The indictment stated that the object of the conspiracy charged was to 'to knowingly devise a scheme to defraud the City of Philadelphia and its citizens of the right to defendant Corey Kemp's honest services in the affairs of the City of Philadelphia, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and to use the United States mails and other interstate delivery services and interstate wire communications to further the scheme to defraud.'

(N.T. 4/7/05, p. 26).

■ Thus, in the language of *Dobson*, the jury was charged on the "overarching scheme" encompassed by the conspiracy count. The Court believes that because the jury's conviction of Holck and Umbrell on the charge of conspiracy encompassed a finding that Holck and Umbrell knew of the overarching scheme, any failure to include such a requirement in the charge on the honest services mail fraud counts would not be plain error.

This holding is supported by several opinions of the Third Circuit, most recently in *Government of Virgin Islands v. Rosa*, 399 F.3d 283 (3d Cir.2005) where the trial court instructed the jury that it could convict the defendant of first-degree murder if it found that he acted with "an intent to kill or inflict serious bodily harm against a human being." 399 F.3d at 297. The Court held that the latter half of this formulation of first-degree murder was plainly erroneous. However, because the trial court's *other instructions* (in particular, its instruction on premeditation) correctly imposed a "specific intent to kill" requirement, the Court concluded that the trial court's plainly erroneous first-degree murder instruction did not prejudice the defendant. *Id.* at 296. The Court was convinced by the *totality* of the instructions that the jury "was cognizant of the fact that the government had the burden to prove that a defendant had the intent to kill if it was to convict him of first-degree murder." *Id.*

Similarly, in *United States v. Klein,* 515 F.2d 751 (3d Cir.1975), because the court held that the government had not proven knowledge of an illicit purpose of the underlying scheme for the purposes of a conspiracy charge, it was compelled to reach the same conclusion regarding the substantive mail fraud charge, and reversed Klein's convictions on both charges. The court reasoned, in support of its conclusion, that the government was required to prove the same knowledge required for the substantive offense of mail fraud as it was required to prove for the conspiracy charge, and thus a failure to prove such knowledge on one charge was fatal to the conviction on both charges:

> 'The knowledge of the parties [to the conspiracy] is relevant to the same issues and to the same extent as it may be for the conviction of the substantive offense.' With respect to the instant *conspiracy to commit mail fraud,* therefore, the government was required to prove the *same knowledge required for*

*the substantive offense,* that is knowledge of the scheme to defraud....

*Klein,* 515 F.2d at 753, n. 3 (emphasis added). *See, also, United States v. Curran,* 20 F.3d 560 (3d Cir.1994) for a similar holding as in *Klein.*

In the instant case, the Court believes that it correctly charged the jury on the conspiracy count and on the honest services mail fraud count. Even if the Court did not use the precise "culpable participation" language as now required by *Dobson,* the Court believes, as held in *Hawkins,* the overall charge, by virtue of the detailed charge on honest services fraud, buttressed by the correct charge on conspiracy, as to which Holck and Umbrell were convicted, provides additional distinction from the holding in *Dobson.* Because Holck and Umbrell were convicted of conspiracy, the jury made a finding that Holck and Umbrell had knowledge of and participated in the alleged scheme of corrupting Kemp. This was a finding equivalent to "culpable participation."

### B. *Additional Jury Charge Issues*

■ Holck and Umbrell complain about the Court's charge on conspiracy and honest services law. As noted above, the Court maintains that it has appropriately and properly construed Third Circuit case law defining conspiracy and a conspiracy to commit honest services mail or wire fraud, as well as aiding and abetting a substantive offenses of honest services mail fraud. The Court acknowledges that it charged the jury in accordance with this interpretation as set forth in the Court's earlier opinion of October 29, 2005, 2004 WL 261207. The Court ascertains no point in again reviewing its interpretation.

However, at oral argument, counsel for Holck vigorously argued that the Court's charge to the jury failed to convey to the jury the essential theory of the government's case, not only the formal conspiracy claim as set forth in the charging paragraph of Count 1, but that further explanation should have been made to the jury that the "manner and means" of carrying out this conspiracy, involved White corrupting Kemp. Counsel are correct that the Court did not delineate this in exact words, but the Court concludes that settled Third Circuit law does not require that the Court's charge detail the underlying facts which the grand jury asserted in the "manner and means" description of the conspiracy, as part of the jury charge.

Instead, Third Circuit law is clear that the judge discharges the duty to charge the jury by relating the elements of the crimes charged in an understandable manner, and the Court believes that it complied with this requirement. However, Holck and Umbrell fail to point out that the Court did give some specific charges to the jury which noted their contentions and defenses.

The first of these was that Holck and Umbrell contended they should not be convicted for merely making bona fide loans, as that is part of the ordinary course of business of a bank. There was no dispute that the loans were bona fide; one issue was reasonableness. The Court advised the jury of this factual issue. *See* N.T. 4/7/05 at 45, 46–7.

> Defendants, Holck and Umbrell, on the other hand, contend that the loans at issue were commercially reasonable loans made in the ordinary course of business extended by Commerce Bank, a financial institution engaged in the business of banking, including the making of loans.

(4/7/05, p. 45)

\* \* \* \* \* \*

Now, one more word about loans. There has been a lot of evidence in this

case about loans. The government alleges that Defendant Kemp and/or his relatives and his church received loans from Commerce Bank that were gifts under the quid pro quo or bribery aspect of honest services fraud. However, the government contends only the loans to Kemp himself were subject to disclosure under the conflict of interest aspect of honest services fraud. The government must prove beyond a reasonable doubt the elements of the crime of honest services fraud as I have defined them.

In making this determination, you should consider all of the evidence you consider credible or worthy of belief on this issue.

Some of the factors you should consider in making this determination are whether Defendant Holck and/or Defendant Umbrell followed established Commerce Bank procedures applicable for similar loans, whether they intended to give a benefit or gift to Defendant Kemp, whether the loans were commercially reasonable, made in the ordinary course of business, whether the loans were considered by Defendant Kemp to be a benefit or gift, the terms of the loans and other factors that were the subject of evidence in the case and that you consider material.

(4/7/05, pp. 46–47)

The Court also charged the jury that, despite much evidence about political contributions and favoritism in awarding city contracts, that such activities alone were not unlawful. The Court also charged the jury that the business relationship between Commerce Bank and Ronald White was lawful. *See* N.T. 4/12/05 at 252.

There has been testimony in this case about consultants, about seeking business, making political and charitable contributions and similar matters.

For example, there is no dispute that Commerce Bank hired Ronald White as a consultant and elected him to its board to help it get business. There is nothing illegal about these activities in and of themselves.

Also, individuals have a constitutional right to engage in political and charitable activity, including raising money for these activities. The issue in this case is whether the crimes charged, as I have defined them, have been proven.

(4/12/05 at 252).

Notwithstanding all of the above contentions of Holck and Umbrell explained to the jury, the Court concludes that Holck and Umbrell were incorrect that they were entitled to a specific charge that Ronald White was the mastermind of the scheme, or that the government's theory depended on the jury finding that White had corrupted Kemp. See post-trial argument, 9/16/05 at pp. 24–53. The essence of the charge of conspiracy was a scheme to corrupt Corey Kemp, and charged all of the defendants, including White, Holck and Umbrell, as participants—and Holck and Umbrell's guilt depended on the evidence as to them and the jury's finding of their involvement, completely independent of Ronald White (who, of course, died before the trial).

The Court has reviewed the proposed jury charges of Defendants Holck and Umbrell (Doc. Nos. 826–827) and does not find any such requests, that the Court charge the jury that it had to find the scheme as described in the "manner and means" of the indictment. The Court has also looked at the "Exceptions to the jury charge as delivered on April 7, 2005 of Defendants Glenn Holck and Stephen Umbrell," (Doc. No. 828), and does not find any exception was taken to the charge stating this ground. Furthermore, the transcript of the trial does not show any such exceptions were made verbally. (4/12/05, pp. 264–71). Holck and Umbrell filed supplemental requests on April 8,

2005, and did not make any such requests at that time. Therefore, the Court finds that this ground for relief is precluded by Rule 52 F.R.Crim. P. and is not plain error.

### C. Whether a New Trial Should Be Granted or a Hearing Held as to Juror No. 6's Alleged Failure to Disclose Part–Time Position as a Real Estate Agent

Holck and Umbrell contend that Juror No. 6's occupation was listed on a prospective questionnaire as an accountant, and that when asked questions about her livelihood, she did not give a complete answer that included information about her part-time work as a real estate agent. Specifically, through affidavits signed by the defense lawyers themselves detailing hearsay reported to them by the jury Foreman, Defendants urge that because of her mortgage "expertise," Juror No. 6 had preconceived notions about the effect of credit scores on mortgage rates, and she relied upon these opinions during jury deliberations. According to the same hearsay account, Defendants further aver that she told other jurors that the Kemp mortgage was commercially unreasonable, which was likely to be given credence because they knew she was a realtor. Finally, they contend that one particular juror, Juror No. 3, relied on Juror No. 6's statements because of his lack of experience with mortgages. After defense counsel filed their affidavits, the government filed an affidavit by Juror No. 6 herself, which in part contradicts, and in part clarifies or explains, the hearsay statements in defense counsel's affidavit.

### 1. Alleged Juror No. 6's Misconduct and Bias in "Concealing" Her Part–Time Occupation as a Real Estate Agent during Voir Dire

■ Holck and Umbrell first assert that if Juror No. 6 had disclosed that she held a part-time position as a real estate agent during voir dire questioning, they would have removed her for cause.

In *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), the Supreme Court held that to obtain a new trial because of a juror's erroneous answer to *voir dire* questions, "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556, 104 S.Ct. 845; *United States v. Hodge,* 321 F.3d 429, 441 (3d Cir.2003).

### a. McDonough Prong One: Intentional Withholding of Material Information

■ The first prong of the *McDonough* test requires a showing that the juror intentionally and deliberately withheld material information. *McDonough,* 464 U.S. at 556, 104 S.Ct. 845. However, a "mistaken, though honest" answer is insufficient to necessitate a new trial. *McDonough,* 464 U.S. at 555–56, 104 S.Ct. 845; *Hodge,* 321 F.3d at 441. Moreover, "jurors cannot be faulted for failing to disclose certain information when they were never asked during the course of *voir dire* to make such disclosures." *Government of V.I. v. Sampson,* 1997 WL 143946, at *3 (Terr.V.I. March 10, 1997). That is, failure to volunteer information does not suffice to satisfy the first prong of the *McDonough* test. *Id.*

Defendants argue Juror No. 6 concealed her status as a licensed real estate professional. D. Br. at 161. Specifically, they allege that she "deceived" the Court and the parties by listing that she was an

accountant on a prospective juror questionnaire and that during *voir dire:* (1) she declined to answer truthfully that she was a real estate agent when asked about her occupation and (2) she deceptively answered that she had no substantive experience in public finance, banking or securities when in fact her real estate experience provided "unique and extensive" experience with the mortgage approval process. *Id.* at 162–63. The government counters that Juror No. 6 responded truthfully to questions regarding her livelihood, both on the questionnaire and during *voir dire* questioning, and that Defendants had made no showing that she had any experience whatsoever in public finance, banking or securities. Govt. Resp. at 117–18.

Despite Defendants' bold assertion that she "declined to answer truthfully" and made "false statements," the record simply fails to bear this out. *McDonough* plainly requires an affirmative dishonest statement on *voir dire,* which Defendants fail to demonstrate. Juror No. 6 asserted she worked 37.5 hours per week as an accountant. Juror No. 6 affidavit at 1. She also had a second, part-time job assisting clients in buying and selling homes.[11] *Id.* Thus, her reply of "accountant" to Question 12 of the Juror Qualification Questionnaire, which asks prospective jurors to fill in their "usual occupation, trade or business," simply cannot be considered a dishonest answer. U.S. District Court Custom Form No. F–15467, at question 12. Further, the court notes that the questionnaire provides an extremely small space to fill in a prospective juror's usual occupation and specifically does not inquire into additional or part-time occupations. *Id.* Given the primacy of her "usual" full-time

work as an accountant, it defies common sense to have expected Juror No. 6 to fill in also her part-time job.

As to the specific questioning regarding her occupation and expertise, there is similarly no evidence of affirmative misrepresentation. During *voir dire,* Juror No. 6 was asked the following about her employment:

Counsel: I want to ask you a couple of questions.

You are an accountant?

Juror No. 6: Yes

Counsel: You work for TPI?

Juror No. 6: Yes.

Counsel: What is TPI?

Juror No. 6: Temple Physicians, Inc. We do billing for physicians, yes.

Counsel: So it's strictly a physician billing service.

Juror No. 6: Yes.

2–14–05 tr. at 245–46. She was also asked "Do any of you or your close friends or relatives work in the fields of public finance, banking or securities or have substantive experience in these fields?" D. Br. at 163, citing 2–14–05 tr. at 93. Juror No. 6 failed to answer in the affirmative. *Id.*

The plain language of defendant counsel's own *voir dire* questions[12] demonstrates that despite Holck and Umbrell's assertion that Juror No. 6 was "asked the simple question of what she did for a living," the truth is that she was never asked an open-ended question about her occupation at all. Rather, she was asked specifically whether she worked as an accountant for Temple Physicians, to which she truth-

---

11. Juror No. 6 states she has assisted on the sale of approximately twenty-five properties since she began work as a realtor three and a half years ago.

12. Defendant Hawkins' lawyer actually questioned Juror No. 6 regarding her livelihood because the court requested that counsel rotate their questioning of venire members.

fully responded affirmatively. 2–14–05 tr. at 245–46.

As to the question regarding her expertise, even assuming as true Defendants' contention that Juror No. 6 had "substantial experience in" the mortgage approval process which she shared in the jury room, it is simply a mischaracterization to say Juror No. 6 affirmatively lied when asked whether she worked or had substantive experience in "public finance, banking or securities." Juror No. 6 clearly did not work in any of those fields directly—she was not employed by a bank, securities or finance corporation—and she further asserts she has neither "expertise in the area of mortgages and lending" nor "any training in these areas." Juror No. 6 affidavit at 2. While it would not be unusual for a part-time realtor to have *some* knowledge of the *mortgage* application process, it belies common sense to conclude this equates to *substantial* experience in *banking*. Moreover, even assuming Juror No. 6 had some experience, if she understood the question to relate to common banking and not mortgages, her "mistaken, though honest" answer to the *voir dire* question in the negative would be an improper basis to grant a new trial. *McDonough*, 464 U.S. at 555–56, 104 S.Ct. 845; *Hodge*, 321 F.3d at 441.

The situation at hand is dramatically different from those in *United States v. Colombo*, 869 F.2d 149 (2d Cir.1989), and *Abiff v. Government of Virgin Islands*, 313 F.Supp.2d 509 (D.Vi.2004), cases cited by the Defendants to illustrate when a court should properly find intentional misstatement. In *Colombo*, the juror affirmatively withheld the fact that her brother was a lawyer for the government when specifically asked if any relatives were lawyers. *Colombo*, 869 F.2d at 152. In *Abiff*, the juror failed to disclose knowing the defendant's family and his alibi witness when specifically asked whether he knew the defendant or his witnesses. *Abiff*, 313 F.Supp.2d at 512. In contrast to those outright lies, Defendants here have averred no facts suggesting Juror No. 6 made any affirmative dishonest statements on the jury questionnaire or during *voir dire* questioning. Juror No. 6's failure to voluntarily provide more information not directly solicited by counsel does not equate to intentional or deliberate withholding of material information under the law. *Sampson*, 1997 WL 143946, at *3. Defendants have failed to fulfill the first prong of the *McDonough* test.

### b. *McDonough Prong Two: Valid Basis for Challenge for Cause*

Assuming for the sake of argument that Defendants could show Juror No. 6 intentionally misstated a material fact, *McDonough* also requires that defendants establish that a truthful response on *voir dire* would have provided a valid basis for a challenge to remove her for cause. *McDonough*, 464 U.S. at 556, 104 S.Ct. 845. The main factor in determining whether a particular juror should be excused for cause is whether the juror "holds a particular belief or opinion that will prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *U.S. v. Murray*, 103 F.3d 310, 323 (3d Cir.1997). This generally requires a showing of actual, implied or inferred bias or impartiality, which may be demonstrated through a "personal relationship with a party, witness or attorney in litigation, or a biased state or mind concerning a party or issue in case." *United States v. Greer*, 285 F.3d 158, 171 (2d Cir.2002); *Abiff*, 313 F.Supp.2d at 513.

Holck and Umbrell first assert that Juror No. 6's statements and conduct during the deliberations evidence her "undeniable

bias concerning an issue in the case: the propriety of the Kemp Mortgage." D Br. at 164. Specifically, they allege that Juror No. 6 came to the trial with "preconceived notions" of this issue and "was not going to be swayed in her beliefs" by evidence produced at trial. *Id.* at 165. Thus, had she revealed she was a realtor, they would have asked more about the issue during *voir dire*. Such inquiry, they contend, would have revealed Juror No. 6 was unable to lay aside her preconceived opinions about the role of credit scores in the mortgage approval process, which in turn would have resulted in disqualification for cause. *Id.* Second, characterizing Juror No. 6's statements as affirmative misrepresentations, Defendants argue that "deliberate concealment or purposefully incorrect responses during *voir dire*" evidences an interest strongly suggesting partiality that in and of itself warrants a for-cause challenge. *Id.* at 166–67 (citing *Columbo*). In response, the government counters that any challenge based on Juror No. 6's occupation, occupational knowledge, or even preconceived opinions would be improper in the absence of a showing of specific bias, which it asserts is lacking here. Govt. Resp. at 121–23. Further, the government urge any reliance on personal experience used by Juror No. 6 in reaching her conclusion was permissible and in no way evidenced preconceived notions regarding bias or defendants' guilt. *Id.* at 124.

■ Defendants' assertion that Juror No. 6 came to the trial with "preconceived notions" and "was not going to be swayed in her beliefs" by evidence produced at trial is baseless. It is settled law that some knowledge of the facts or issues involved in the case or even a preconceived, but not fixed, notion as to the guilt or innocence of an accused, without more, is insufficient cause for dismissal. *Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639,

6 L.Ed.2d 751 (1961); *United States v. Polan,* 970 F.2d 1280, 1284 (3d Cir.1992). Similarly, the mere fact that someone is a member of a certain occupation or organization is not sufficient cause for dismissal, absent a particularized showing of bias. *U.S. v. Todman,* 117 Fed.Appx. 824, 826 (3d Cir.2004) (*non-precedential opinion* holding juror's employment as a legal assistant for an organization representing indigent people was not, in and of itself, a sufficient basis for finding implied bias); *United States v. Salamone,* 800 F.2d 1216, 1226 (3d Cir.1986) (holding that trial court erred in wholesale removal of all members of the National Rifle Association without individual *voir dire* questioning). *See also United States v. McIntyre,* 997 F.2d 687, 697–98 (10th Cir.1993) (improper to disqualify juror merely because he was a former police officer); *United States v. Apodaca,* 666 F.2d 89, 94 (5th Cir.1982) (no abuse of discretion by district court for refusing to dismiss juror because he worked for federal law enforcement).

The mere fact that Juror No. 6 was employed as a part-time realtor would not alone have constituted cause for dismissal. Defendants have set forth no facts indicating Juror No. 6 had any specific bias against them from the outset of the trial. Unlike other occupations which might predispose a juror to align with one party (law enforcement officer aligned with the prosecution, for example), there is nothing to suggest a realtor would have any preconceived beliefs about any of the parties to this case. In fact, Juror No. 6 could not possibly have formed an opinion as to the propriety of the Kemp mortgages until she heard the evidence about the mortgage presented *at trial.* Moreover, as discussed more extensively below, to the extent that she relied on personal experience in making that decision, that was perfectly permissible. *Wilson v. Vermont Castings, Inc.,* 170 F.3d 391, 395 (3d Cir.1999). Fi-

nally, defendants' argument that lying during *voir dire* itself evidences a partiality warranting dismissal is inapposite; it depends on their characterization of Juror No. 6's statements as direct misrepresentations, a premise we reject. In sum, the second prong of *McDonough* is not satisfied.

Because defendants fail to satisfy both prongs of the test articulated in *McDonough,* a new trial is not warranted based on any misconduct by Juror No. 6 during *voir dire.*

### 2. *Introduction of Extrinsic Evidence into Deliberations*

Defendants additionally move for a new trial, or alternately an evidentiary hearing on the issue, based on Juror No. 6's alleged introduction of prejudicial extraneous information regarding the effect of credit scores on the mortgage application process into jury deliberations.

 It has long been settled law that a juror may not impeach his own verdict once the jury has been discharged. *McDonald v. Pless,* 238 U.S. 264, 267, 35 S.Ct. 783, 59 L.Ed. 1300 (1915); *United States v. Lloyd,* 269 F.3d 228, 237 (3d Cir.2001); *Wilson,* 170 F.3d at 394; *Gov't of V.I. v. Gereau,* 523 F.2d 140, 148 (3d Cir.1975). The rule promotes several public policies, including "promot[ing] finality of verdicts, encourag[ing] free deliberations among jurors, and maintain[ing] the integrity of the jury as a judicial decision-making body." *Lloyd,* 269 F.3d at 237. However, an exception to the general prohibition against evidence of jury deliberations permits inquiry into extraneous prejudicial influence, so as to insure defendants' guilt was determined by unbiased juries based solely upon evidence properly admitted in court. *Mattox v. United States,* 146 U.S. 140, 149, 13 S.Ct. 50, 36 L.Ed. 917 (1892) (holding a "jury-

man may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind."); *Lloyd,* 269 F.3d at 237. Codifying the common-law rule and exception, Federal Rule of Evidence 606(b) seeks to balance these conflicting interests. *Id.* The Rule provides:

> Upon an inquiry into the validity of a verdict or indictment, *a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind* or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, *except that a juror may testify on the question whether extraneous prejudicial information* was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Fed.R.Evid. 606(b) (emphasis added). Thus, while a court may investigate whether "extraneous prejudicial information was improperly brought to the jury's attention" under Rule 606(b), the scope of inquiry is limited. *Wilson,* 170 F.3d at 394. The court may only look so far as to verify the existence of extraneous information. Once this is established, it may not inquire "into the subjective effect of such information on the particular jurors." *Id.; Lloyd,* 269 F.3d at 237.

 To warrant a new trial based on extraneous information, the defendant must make a two-part showing: first, that the jury was exposed to extraneous evi-

dence and second, that the defendant likely suffered "substantial prejudice" as a result of the jury's exposure to the extraneous information. *Id.; United States v. Gilsenan,* 949 F.2d 90, 95 (3d Cir.1991). "Extraneous influence" has been interpreted to cover, among other things, consideration by the jury of facts and evidence not admitted in court. *Gereau,* 523 F.2d at 149–50. In examining for "prejudice," courts must conduct "an objective analysis by considering the probable effect of the allegedly prejudicial information on a hypothetical average juror." *Lloyd,* 269 F.3d at 238. The party seeking the new trial bears the burden of demonstrating prejudice. *Id.*

■ Defendants allege Juror No. 6 introduced extraneous evidence by stating to her fellow jurors that based on her experience with mortgages as a realtor, she knew (1) persons with credit scores similar to Cory Kemp do not normally receive mortgages with terms akin to those in the Kemp Mortgage, (2) Kemp would not have received a mortgage on those terms but for his position as City Treasurer. D. Br. at 171; Marino Affidavit at ¶ 8; Lustberg Affidavit at ¶ 8. However, Juror No. 6's own affidavit refutes these suggestions, and the Court gives much more weight to her personal account than to the double hearsay in the defense counsel affidavits. Arguing that the prosecution offered no evidence on the commercial reasonableness of the loan, and alleging that Juror No. 6 elevated her stature by handing out her realtor business card to her fellow jurors, Defendants contend that this non-record information violated their Sixth Amendment rights. D. Br. at 168; D. Reply at 89–90. The government argues precisely the opposite: with reference to her own affidavit, Juror No. 6 states (¶ 9) that she merely relied on personal experience when deliberating.

Overwhelming caselaw in the Third Circuit and elsewhere clearly establishes that Juror No. 6's conduct is perfectly permissible, and does not amount to "extraneous" information, even when that experience is rather unique and focused on the controversy at issue. The Third Circuit has made clear that jurors can and should draw upon prior life experiences and use them in the course of deliberations. *Wilson,* 170 F.3d at 395; *Gereau,* 523 F.2d at 151. Such conduct does not amount to bringing in extraneous information. *Dickerson v. DiGuglielmo,* 2004 WL 1465662, at *6 (E.D.Pa. June 29, 2004) (holding "no extrinsic evidence was brought into jury deliberations" when, in drug case, two jurors discussed their personal life experiences with crack cocaine), adopted 2004 WL 1753258 (E.D.Pa. Aug.5, 2004).

While defendants concede that juror reliance on ordinary personal experience during deliberations is permissible, they argue that the caselaw only supports relying on "normal observations of one's surroundings that a person accumulates in the course of normal life." They contend that Juror No. 6's statements here were extraneous evidence because the information was gleaned from specialized knowledge that was specifically relevant to the issues in dispute in the action. D. Br. at 173. That, they urge, is not the type of "ordinary personal experience" permitted under the law.

■ A review of the caselaw—in the Third Circuit and elsewhere—simply does not bear out Defendants characterization of the issue. "A juror's specific knowledge about a particular subject matter is not dispositive of whether the information imparted is beyond the ken of common experience." *United States v. Tin Yat Chin,* 275 F.Supp.2d 382 (E.D.N.Y.2003); *Cocconi v. Pierre Hotel,* 146 F.Supp.2d 427, 432 (S.D.N.Y.2001). Thus, in *Wilson,* the

Third Circuit clearly held that even when a juror's experience is specialized and focused specifically on the controversy at issue, it is not "extraneous" so long as it draws on personal experience. *Wilson*, 170 F.3d at 395. There, the plaintiff brought a products liability action against a wood-burning stove manufacturer after she was seriously burned when she left a side door on the stove open to help start the fire. *Id.* at 393. Although the jury found that the stove was defective, the defendant prevailed because the jurors also concluded the defect was not a substantial factor in causing the plaintiff's injuries. *Id.* After trial, plaintiff learned that a juror who owned the same stove consulted the manual during the trial to see if there were any warnings and informed her fellow jurors of the contents. *Id.* at 394. She also told the other jurors that she routinely found it necessary to leave the door open to start a fire, and that she intended to continue the practice even if there was a warning. *Id.* Affirming the district court's conclusion that neither a hearing nor a new trial was warranted, the Third Circuit held that while the contents of the manual itself was "extraneous,"[13] her *knowledge of, and opinions about,* the stove were not extraneous. *Id.* at 395. Significantly, the court noted that the juror's statements were in part adduced by her own experience as an owner of the stove, and were thus "similar to the permissible instance of a juror bringing her own life experience into a jury room" even though obviously rather unique and directly related to the issue being litigated. *Id.* at 395 n. 4.

Turning to the case at hand, we find persuasive the government's argument that through the purchase of homes or cars, many average citizens have a working knowledge of credit reports. The effect of a bad credit score on one's ability to acquire desirable financing is certainly not the exclusive purview of experts. Defendants could not possibly have expected that no jurors would be familiar with credit ratings and FICO scores. Assuming arguendo that Juror No. 6 had more than average experience with the mortgage approval process and both relied upon and shared this knowledge with her fellow jurors during deliberations, this does not make her jury service improper.

Juries have long been instructed—in federal as well as in state courts—to do precisely what Juror No. 6 did. *Grotemeyer v. Hickman*, 393 F.3d 871, 879 (9th Cir.2004). The mere fact that Juror No. 6 brought her personal experiences and knowledge into deliberations, and this was not shared by every other member of the jury, does not convert personal experience accumulated in the course of normal life into extraneous information. As in *Wilson*, which we find to be authoritative, Juror No. 6 brought to bear her experience and applied it to defendants' case. Furthermore, the information Juror No. 6 allegedly discussed during deliberations was actually much less specific to Defendants' case than was the case in *Wilson.* There, the juror had experience with the *actual stove that was the subject of the litigation.* Assuming the Defendants allegations as true, Juror No. 6 only had experience with the general mortgage *industry,* not Mr. Kemp's mortgage in particular. Certainly if the *Wilson* court did not find the juror's unique knowledge of the object of the controversy at issue to be "extraneous," neither can Juror No. 6's general knowledge of mortgages be.

---

13. The court also concluded, however, that the manual was not "prejudicial" and thus not grounds for a new trial.

Thus, we conclude that no impermissible extraneous evidence was discussed.

Defendants' reliance on *Hard v. Burlington Northern Railroad,* 812 F.2d 482 (9th Cir.1987) and *United States v. Navarro–Garcia,* 926 F.2d 818 (9th Cir.1991) is inapposite. In *Hard,* where a juror who was a former employee of the defendant railroad told other jurors of the company's specific settlement practices, the Ninth Circuit determined this was extraneous evidence. *Hard,* 812 F.2d at 486. However, that juror's experience *related directly to a party to the litigation,* a stark contrast to this case. In *Navarro–Garcia,* the jury foreman conducted an experiment during the trial to determine the credibility of the defendant's contention that he was unaware that a large quantity of drugs were in his trunk. Similarly, this species of misconduct—juror experimentation during the pendency of the trial—is simply not at issue here.

Furthermore, we note that whatever persuasive effect *Hard* and *Navarro–Garcia* are supposed to have, we find the Ninth Circuit's more recent decision in *Grotemeyer v. Hickman* more convincing. *Grotemeyer,* 393 F.3d 871. Similar to the case at hand, the *Grotemeyer* concluded that even a juror's *specialized professional training* is not beyond the bounds of permissible personal experience. *Id.* at 878, 880. Specifically, the court held that the opinions of a jury foreman, who was a physician, that defendant was mentally ill and would receive treatment as part of a sentence was not extraneous information. *See also Crawford v. Head,* 311 F.3d 1288, 1331 (11th Cir.2002) (nursing student juror's statements explaining scientific tests conducted on hair and blood samples at issue in murder case not extraneous); *Cocconi v. Pierre Hotel,* 146 F.Supp.2d 427, 432 (S.D.N.Y.2001) (holding it was not improper for corporate travel consultant to convey her occupational knowledge of the New York hotel industry to fellow jurors because such information concerns the general reputations of well-known public places and, in any event, was not prejudicial).

Juror No. 6's conduct did not amount to the introduction of "extraneous" information. Because no impermissible extraneous evidence was discussed, defendants did not suffer any prejudice.

**3. *Hearing Is Not Necessary Under the Facts***

As an alternative to a new trial, defendants argue that a hearing is necessary to determine whether Juror No. 6 introduced extraneous prejudicial information into jury deliberations during their trial.

■■■ Defendants properly note that in certain cases, an evidentiary hearing into juror misconduct is appropriate or even required. *Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); *Gilsenan,* 949 F.2d at 96. However, allegations of juror exposure to prejudicial extra record information do not automatically require courts to conduct an evidentiary hearing. *Id.* at 97; *United States v. Console,* 13 F.3d 641, 667–68 (3d Cir.1993). In fact, the Third Circuit has expressed its disfavor for post-trial evidentiary hearings to address claims of juror misconduct, explaining that the court is "always reluctant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct, or extraneous influences." *Gilsenan,* 949 F.2d at 97 (external quotations omitted).

In *Gilsenan,* the Third Circuit held that the trial court's refusal to grant an evidentiary hearing to determine what extra-record information the jury may have received and whether it was prejudiced was not an abuse of discretion. *Id.* In that

case, a RICO and Hobbs Act prosecution, jurors were allegedly exposed to news coverage of a rejected plea proposal. The court concluded that a hearing need not be held at the request of a party whose allegations if established, would not entitle it to relief. *Id.* Moreover, because Rule 606(b) limits inquiry to whether extraneous prejudicial information was introduced and bars investigation into the subjective effect of such information on particular jurors, the *Gilsenan* court noted that no juror could be asked about the effect of information on its verdict directly. *Id.* at 96, citing Fed.R.Evid. 606(b). Similarly in *Wilson*, discussed above, the court affirmed the trial court's decision not to hold an evidentiary hearing on the issue of extraneous information because the court had sufficient facts before it and more inquiry would violate F.R.E. 606(b). *Wilson*, 170 F.3d at 395 n. 5, referencing *Wilson v. Vermont Castings*, 977 F.Supp. 691, 695 (M.D.Pa.1997).

Here, the only purpose of a hearing could be to ask other jurors whether any extraneous material or information was brought to their attention. Any hearing to review what effect the information had on deliberations remains barred by F.R.E. 606(b). Defendants would seem to have us consider the effect of Juror No. 6's alleged conduct and statements on another Juror. Specifically, through their hearsay account of a conversation with the jury Foreman, defendants contend that Juror No. 3 relied on Juror No. 6's statements about the Kemp mortgage because of her apparent expertise in the field. D. Br. at 159–60; D. Reply at 90; Marino Affidavit at ¶ 10; Lustberg Affidavit at ¶ 10 (Juror No. 3 purportedly stating that, because of his utter lack of experience with mortgages, he was "going with [Juror No. 6] on this one."). Such inquiry is plainly improper under F.R.E. 606(b). *Lloyd*, 269 F.3d at 237–38. As to a hearing serving to verify

the existence of extraneous information, the defendants and the government have already provided the Court with affidavits which give it notice of the nature of the alleged improper conduct. Assuming all defendants' allegations to be true, we have already decided that Juror No. 6's statements do not constitute extraneous prejudicial information. As in *Gilsenan,* a hearing would be unnecessary and redundant and is therefore denied. To hold otherwise would be to undermine the public policies advanced by Rule 606(b), including promoting finality of verdicts and open deliberations among jurors. *Lloyd,* 269 F.3d at 237.

For the foregoing reasons, defendants' motion for a new trial, or alternately an evidentiary hearing relating to Juror No. 6, is denied.

### D. *The Court Allowed Adequate Voir Dire, including the Opportunity Of Individual Defense Counsel to Question the Potential Jurors*

Holck and Umbrell assert that they were denied sufficient voir dire of the potential jurors, particularly relating to FICO scores, lending practices and loan denials. Holck and Umbrell are correct that the Court declined to ask the questions relating to individual prospective juror's FICO scores or their knowledge of lending practices and whether any of them had been denied loans.

The Court believes that it allowed very liberal *voir dire* in this case, including giving each defense lawyer an opportunity to question each prospective juror—which does not occur frequently in this Court. However, the Court felt that requiring each venire person to relate their own FICO score could be an invasion of privacy, and was not relevant to the juror's

qualifications to be fair and impartial in this case.

 The Supreme Court has instructed that "[b]ecause the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the voir dire." *Rosales–Lopez v. United States,* 451 U.S. 182, 189, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981). "What is required of the district court is that it make those inquiries necessary to satisfy both its duty to select an impartial jury and allow for intelligent exercise of peremptory challenges." *Butler v. City of Camden,* 352 F.3d 811, 815 (3d Cir.2003); (citing *United States v. Napoleone,* 349 F.2d 350, 353 (3d Cir.1965)). Rarely does a district court's failure to ask a particular question result in a reversal on appeal. *Id.* at 817. Moreover, the broad discretion of a federal district court is "well established under federal case law, and an abuse of discretion will only be found where the district court's voir dire examination is 'so general that it does not adequately probe the possibility of prejudice.'" *Id.* at 815 (quoting *Waldorf v. Shuta,* 3 F.3d 705, 710 (3d Cir.1993)). However, a finding of error and reversal has occurred when "the district court barred all inquiry into a relevant subject matter designed to elicit a disqualifying prejudice." *Id.* at 817.

In the present case, the Court did not refuse all inquiry into the potential jurors' knowledge of the banking industry. The court questioned potential jurors as to whether they or a close friend or relative had been employed by a bank or financial institution, had a substantial dispute with a bank, or had a bad experience with a bank. *See* Tr. 2–14–05, at 80–101. This information was enough to make a determination of the impartiality of the potential jurors.

Defendants argue in their reply brief that "[t]he cited questions focus on bank working experience and bank disputes; they have nothing to do with bank lending, FICO scores, or the like." Reply Br. at 78. However, the questions asked were designed to reveal the only relevant information—namely, whether the potential jurors might be prejudiced; specific questions concerning the FICO scores and loan denials of potential jurors were not appropriate because they constituted an invasion of privacy and/or would have failed to shed light on potential jurors' abilities to be fair and impartial. In *United States v. Haldeman,* 559 F.2d 31 (D.C.Cir.1976), the court held that "mere familiarity with 'the facts and issues involved' in the case would not have rendered a venireman unqualified to sit." *Id.* at 68 (citing *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)). Inquiries concerning the income of potential jurors have been withheld from the voir dire because they are "offensively intrusive." *United States v. McDade,* 929 F.Supp. 815, 818 (E.D.Pa. 1996). The *McDade* court relied upon a Supreme Court decision recognizing that "it is the trial judge who must maintain control of the voir dire process and balance the privacy interests of potential jurors against the historical values that favor open proceedings." *Id.* at 818 (quoting *Press–Enterprise Co. v. Superior Court of California,* 464 U.S. 501, 511–12, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)). Referring to the specific voir dire questions concerning wealth, the *McDade* court wrote:

> The amount of one's income is personal. Although the salaries of those who work in the public sector or for publicly held companies are often an open book, in plain public view, private income is another matter. Except for the taxing authorities, who are statutorily required

to keep such information under wraps, what one makes is no one else's business. That a prospective juror should be required to divulge, under penalty of perjury, and at the enthusiastic behest of all the lawyers in this case, the monetary cubbyhole into which his or her income happens to fall, I find to be beyond the pale.

*Id.* While there is no case specifically addressing voir dire concerning individual jurors' credit history, a person's credit score, much like their income, is a sensitive piece of information that is not readily available to the public. The jurors have a right to maintain their privacy and their credit score is a legitimate concern in maintaining such a standard.

The defense cites *Kiernan v. Van Schaik*, 347 F.2d 775 (3d Cir.1965) as one example of the Third Circuit reversing a decision because the district court refused to include specific questions in the voir dire. In that case, the plaintiffs argued that it was error for the district court to exclude five questions pertaining to potential jurors' connections to insurance companies that the plaintiff had requested be included in the voir dire. *Id.* at 777. The Third Circuit reversed but it is important to note that two of the district court's three reasons for excluding the questions were rooted in the traditions of Delaware practice. *Id.* at 777–78. The district court's final reason—that "a prima facie showing was required of the prospective juror's connection with the business of insurance before the questions would be considered"—was rejected because knowledge of a juror's connection to the insurance industry is important when an attorney determines how to use his limited number of peremptory challenges. *Id.* at 777—82. In contrast, the voir dire in the present case did include questions about any connections that the potential jurors might have with the banking industry.

The defense also points to *United States v. Napoleone, supra,* but the questions that the district court incorrectly excluded from the voir dire in that case specifically asked if potential jurors would be prejudiced by certain misrepresentations made by the defendant and whether they would be unable to consider the charges fairly. 349 F.2d at 352—53. The questions excluded in the case at bar did not directly question the prejudicial effects that certain information might have on potential jurors. Therefore, *Napoleone* does not dictate that the questions asked were sufficient to determine any bias the potential jurors might have.

Another case cited by defendants, *United States v. Butler, supra,* found that the district court conducted an inadequate voir dire. Again, the case is distinguishable from the present one, as in *Butler,* a case about police brutality, the chief concern was that:

> there may have been venirepersons in the jury pool who were dispositioned to credit the testimony of a police officer over that of a civilian simply by reason of the officer's official status, and the district judge failed to engage in questioning which would have assisted him and counsel in identifying such venirepersons.

352 F.3d at 818. The district court did not allow any questions about potential bias for or against the police. *Id.* at 813–14. In this case, the Court asked questions about past experiences that potential jurors may have had with banks, which would have established whether there would be any potential bias. While the Court did not ask all the questions that the defense may have desired, it did ask questions sufficient to establish possible prejudice on relevant subject matter as required by *Butler.*

 "[W]hile impaneling a jury the trial court has a serious duty to determine

the question of actual bias, and a broad discretion in its rulings on challenges therefor." *Dennis v. United States,* 339 U.S. 162, 168, 70 S.Ct. 519, 94 L.Ed. 734 (1950) (citing *Frazier v. United States,* 335 U.S. 497, 511—12, 69 S.Ct. 201, 93 L.Ed. 187 (1948); *United States v. Wood,* 299 U.S. 123, 133—34, 57 S.Ct. 177, 81 L.Ed. 78 (1936)). The Court asked questions that went to a determination of actual bias and did not include those questions which went beyond this scope. There was no error.

### E. *The Court Did Not Err in its Ruling on the Admissibility of Evidence*

 Holck and Umbrell assert that the Court erred in allowing the government to introduce evidence as to three loans which were not made to Kemp, but pursuant to Kemp's request, to third parties, identified as the Schapp, Flores, and church loans. Initially, it should be noted the Flores and church loans were included in the superceding indictment as acts alleged in furtherance of the conspiracy. See Count 1, ¶¶ 179 and 181. As far as the Schnapp loan, the Court admitted it because it was the subject of a request by Kemp to Umbrell, and the jury was entitled to consider whether all three of these loans were part of a stream of benefits which Holck and Umbrell extended in order to secure Kemp's favored treatment of Commerce. As the government argued to the jury, and as the jury was told, the Flores, Church and Schnapp loans were not subject to disclosure by Kemp and thus could only be considered with respect to the bribery prong of honest services fraud. *See* N.T. 4/7/05 at 46.

### 1. *Admissibility of the Flores and Church Loans*

Relevant evidence is defined in the Federal Rules of Evidence as anything "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. The relevance of these loans in proving the bribery prong of the honest services fraud can hardly be questioned, and the Defendants make no attempt to challenge it.

Beyond the determination of relevance, however, evidence still may be excluded under Federal Rule of Evidence 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The Third Circuit has held that a Rule 403 determination is one best made by the trial court judge in the courtroom, stating that "if judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." *United States v. Long,* 574 F.2d 761 (3d Cir.1978).

For exclusion under Rule 403 to be justified, the probative value of evidence must be "substantially outweighed" by the problems in admitting it. Therefore, evidence that is highly probative is exceptionally difficult to exclude. *See Coleman v. Home Depot, Inc.,* 306 F.3d 1333, 1344 (3d Cir. 2002). The Flores and church loans appear to amount to just such highly probative evidence, as the loans were alleged in the indictment to have resulted in a $20 million deposit of city funds at Commerce and a City purchase of a certificate of deposit from Commerce, respectively. Again, Defendants do not appear to argue the admissibility of the evidence under Rule 403.

Beyond the relevance and admissibility of the evidence, Defendants argue that the

instruction given by the Court was not sufficiently specific as to indicate to the jury that the two loans in question were only to be considered with respect to the bribery prong of honest services fraud. However, the Court charged the jury correctly on the bribery prong by reference to a "stream of benefits." There was an adequate charge on loans, *see* p. 30 above. Holck and Umbrell did not take exception to this charge, and thus the argument is foreclosed, because there was no plain error.

#### 2. *Admissibility of the Schnapp Loan*

■ As stated at page 4 above, Schnapp was a friend and relative of Kemp, who received a $10,000 loan from Commerce at Kemp's request. Looking at Third Circuit decisions on the matter, it appears that the evidence is admissible under two separate theories: (1) the Schnapp loan could be viewed as evidence intrinsic to the charged offense outside the auspices of Rule 404(b). The Schnapp loan is relevant if only because of its date, spring 2002, just after Kemp became City Treasurer. It started the series of loans Holck and Umbrell approved to Kemp or at Kemp's request. (2) The admissibility of the Schnapp loan is also proper using a standard Rule 404(b) analysis, notwithstanding defendants' contentions concerning the absence of a limiting instruction.

The government credibly explained why the Schnapp loan was not included in the indictment, but that fact did not preclude its admissibility. *U.S. v. Gibbs,* 190 F.3d 188, 217 (3d Cir.1999). The Court first ruled on this issue as follows:

I find that the Schnapps issue is not really a 404(b) issue. It is attenuated in the sense of the relationships, but because it involves specifically alleged communications by Mr. Kemp to Commerce Bank and it is within the time period, I think it is allowable evidence. I don't find that it is so prejudicial under Rule 404(b) it should be excluded. I'm going to overrule the defendant's objection to that.

Mr. Marino: You are going to admit that with an instruction that it is not being offered as to Mr. Holck, correct?

The Court: Yes.

(N.T. 3/1/03, p. 8). The Court's reference to F.R.E. 404(b) above should have included a citation of F.R.E. 403.

However, the Schnapp evidence was not introduced until over three weeks later, on March 23, 2005. The Schnapp evidence did not mention Holck. No defense counsel renewed the objection or asked for a limiting instruction at that time. (N.T. 3/23/05, pp. 274–328). No instruction on F.R.E. 404(b) was requested for the final charge.

The Schnapp loan evidentiary analysis is in three parts. The first examines the admissibility of the Schnapp loan as intrinsic evidence of the charged conspiracy. The second analyzes the admissibility of the loan under Rule 404(b) and runs through the four-part test for admissibility under this rule as it has been applied in the Third Circuit. Finally, the third part quickly analyzes the cases cited by Defendants in their attempt to show error due to the absence of a limiting instruction under 404(b). The first analysis governs since the loan amounts to more than a prior act and appears to be an actual part of the charged conspiracy.

#### a. *Schnapp Loan as Intrinsic to the Charged Offense*

The first question is whether the Schnapp loan evidence is outside the control of Rule 404(b). Rule 404(b) "does not extend to evidence of acts which are 'in-

trinsic' to the charged offense." Fed. R.Evid. 404(b) advisory committee's note (citing *United States v. Williams,* 900 F.2d 823 (5th Cir.1990)).

The Third Circuit has held that "Rule 404(b), which proscribes the admission of evidence of other crimes when offered to prove bad character, does not apply to evidence of uncharged offenses committed by a defendant when those acts are intrinsic to the proof of the charged offense. Acts are intrinsic when they directly prove the charged conspiracy." *United States v. Gibbs,* 190 F.3d 188, 217–18 (3d Cir.1999).

A leading evidence treatise offers a similar analysis:

> In cases where the incident offered is a part of the conspiracy alleged in the indictment, the evidence is admissible under Rule 404(b) because it is not an "other" crime. The evidence is offered as direct evidence of the fact in issue, not as circumstantial evidence requiring an inference as to the character of the accused. Such proof ... may be extremely prejudicial to the defendant but the court would have no discretion to exclude it because it is proof of the ultimate issue in the case.

22 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5239, at 450—51 (1978). Though referring to such evidence as being "admissible under Rule 404(b)," the authors seem to conclude that the Rule simply does not apply when the act offered does not amount to an "other" crime.

Moreover, the Government in proving overt acts in a conspiracy is not limited by the specific acts listed in the indictment. *See United States v. Schurr,* 794 F.2d 903, 908 (3d Cir.1986) ("It is well settled that the government can prove overt acts not listed in the indictment, so long as there is no prejudice to the defendants thereby."); *United States v. Adamo,* 534 F.2d 31, 38–

39 (3d Cir.1976) ("There is general agreement that the Government is not limited in its proof at trial to those overt acts alleged in the indictment.").

Defendants attempt to avoid the effect of *Gibbs* by arguing that the Schnapp loan "was consistently presented to the jury as a separate bribe." Def's Reply at 96. Defendants also state in their Reply Memorandum that "[o]f course, there was no evidence at all that the Schnapp loan was part of the charged conspiracy." *Id.* at 95. This contention seems to miss the point. Under the intrinsic evidence analysis, the Schnapp loan, as the first loan made by Commerce to Kemp or at Kemp's request shortly after he became City Treasurer, allowing the jury to evaluate when the conspiracy may have begun, and *itself* is evidence of the charged conspiracy and is intrinsic to the proof of the charged offense.

**b. *Schnapp Loan Admissible Under Rule 404(b)***

Considering the admissibility of the Schnapp loan under Rule 404(b), the Third Circuit has held that "Rule 404(b) evidence is especially probative when the charged offense involves a conspiracy," and "[f]or this reason, the Government has broad latitude to use 'other acts' evidence to prove a conspiracy." *United States v. Cross,* 308 F.3d 308, 324 (3d Cir.2002) (citing *United States v. Mathis,* 216 F.3d 18, 26 (D.C.Cir.2000)).

■■■ The general test for admission of Rule 404(b) evidence requires that: "(1) the evidence must have a proper purpose; (2) it must be relevant; (3) its probative value must outweigh its potential for unfair prejudice; and (4) the court must charge the jury to consider the evidence only for the limited purposes for which it is admitted." *United States v. Wilfredo*

*Cruz,* 326 F.3d 392, 395 (3d Cir.2003) (citing *Huddleston v. United States,* 485 U.S. 681, 691–92, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)).

The first requirement of admissibility under 404(b) demands that the Government show a proper evidentiary purpose— it must "clearly articulate how that evidence fits into a chain of logical inferences without adverting to a mere propensity to commit crime now based on the commission of crime then." *United States v. Mastrangelo,* 172 F.3d 288, 295 (3d Cir. 1999). The Third Circuit has held that two proper evidentiary purposes are knowledge of the alleged conspiracy and demonstration of a relationship with a member of the alleged conspiracy. *United States v. Vega,* 285 F.3d 256, 261 (3d Cir. 2002). Here, the Schnapp loan, like the Flores and church loans named in the superseding indictment, involves a borrower associated with Defendant Kemp. In addition, the Schnapp loan was the first transaction with Commerce at Kemp's request after he became City Treasurer. These strong similarities would appear to suffice in establishing the relationship of two of the alleged conspirators, Umbrell and Kemp.

The second requirement in the Rule 404(b) test is relevance under Rule 402. The Supreme Court has explained that "evidence of a similar prior bad act 'is relevant ... if the jury can reasonably conclude that the act occurred and that the defendant was the actor.'" *Vega,* 285 F.3d at 262 (quoting *Huddleston,* 485 U.S. at 689, 108 S.Ct. 1496). The relevance in the instant case is clear.

The third requirement of admission under Rule 404(b) requires that the evidence pass a Rule 403 balancing test. A trial court must carefully weigh the probative value of the evidence against its prejudicial effect and determine that the probative value is not outweighed by the danger of undue prejudice. Again, the individuals involved in the loan and its similarity to the Flores and church loans named in the indictment weighs in favor of admissibility.

The fourth requirement of a limiting instruction is the chief point of argument for defendants. The Court rejects the Government's assertion that the Court's instruction that only loans to Kemp were subject to disclosure (N.T. 4/7/05, p. 46) was sufficient to satisfy the limiting instruction requirement. Defendants contend that language noting that the evidence of the Schnapp loan was not admitted "to prove that defendant is a bad person and thus he was predisposed to do bad things" was necessary.

Evidence admitted under Rule 404(b) does generally require a limiting instruction that functions to ensure that the jury will not use "other crime" evidence to conclude that the Defendant is a bad person. In this context, it must be emphasized the Schnapp loan itself was a loan, not a crime. It is also difficult to characterize it as a "bad act" in and of itself, in that it was the first of the Commerce loans at issue. If it had been both the first and the last such loan, Holck and Umbrell would not be defendants in this case. The Court does not believe a limiting instruction was necessary in this context, and no precedent holds that the absence of a limiting instruction *per se* requires a new trial.

In their reply memorandum, defendants cite several cases which, they argue, stand for the rule that evidence of prior bad acts must be accompanied by appropriate limiting instructions. *See* Def's Reply at 96 n. 48. While these cases do refer to the limiting instructions necessary for the introduction of Rule 404(b) evidence, the facts of the cases are clearly distinguishable from the Schnapp loan. Indeed, these cases support inclusion of such evidence as in-

trinsic proof of the charged conspiracy, without reference to 404(b).

In *United States v. Moore*, 375 F.3d 259 (3d Cir.2004), the defendant was on trial for arson and for possession of a firearm. During the trial, testimony by defendant's former girlfriend and her daughter alleged that Moore was a drug dealer (even enlisting small children in his trade) and habitual drug user and had in the past severely beaten his girlfriend. This evidence is a perfect example of "prior bad acts," as the appellate court noted that "[i]nadmissible evidence and highly inflammatory statements came rolling in unimpeded at Moore's trial." *Id.* at 263. Unlike the drug abuse and dealing alleged in Moore's arson and possession case, the loan evidence in question in this case is related to the activities involved in the conspiracy charge (loans used as part of the quid pro quo of honest services fraud).

Citing the Third Circuit's decision in *United States v. Vega*, 285 F.3d 256 (3d Cir.2002), Defendants argue that a clear limiting instruction was required in order to ensure that the jury considered a 1997 drug transaction only as relevant to defendant's knowledge of the charged 1999 drug conspiracy. In fact, the *Vega* court did note that "prior bad act evidence may be admitted for the purpose of demonstrating Vega's knowledge of a conspiracy and relationship with one of its members." *Id.* at 261. Again, the case is distinguishable from the Holck and Umbrell scenario, since the Schnapp loan was not evidence of a prior bad act (i.e. an earlier and separate conspiracy used to establish knowledge of a later one) but part of the very same conspiracy charged in the indictment.

Defendants also cite *United States v. Scarfo*, 850 F.2d 1015 (3d Cir.1988), in arguing that "clear, frank, and comprehensive [limiting] instructions" are necessary in regard to other crimes evidence. *Id.* at

1021. It was, however, the peculiar circumstances of the case which required such instructions, as the trial court judge noted "that evidence of the defendant's participation in various murders would normally be excluded as irrelevant and unduly prejudicial in a trial for a single extortion scheme," but "in view of the unusual circumstances in this case, the judge concluded that such exclusion would be prejudicial to the government." *Id.* at 1020. Therefore, the *Scarfo* case cannot be read to endorse the broad holding that Defendants ascribe to it in regard to limiting instructions concerning Rule 404(b) evidence. The Schnapp loan is not evidence that "would normally be excluded as irrelevant and unduly prejudicial."

### 3. *Admissibility of Co–Conspirator Statements*

Holck and Umbrell argue that the Court erroneously admitted co-conspirator statements into evidence. There had been extensive pretrial litigation and trial discussion on the issue of admissibility of co-conspirator statements. Holck and Umbrell filed motions requesting the Court to rule on this issue prior to the start of trial, an invitation which the Court declined. *See* Memorandum dated February 10, 2005, 2005 WL 352700, rejecting Holck and Umbrell's legal argument on this point.

However, prior to trial, the Court did say that it would hold a hearing pursuant to F.R.E. 104 at the appropriate point during the trial. The Court noted its findings under Rule 104 as to defendants Kemp, Hawkins and Knight by Memorandum dated March 18, 2005, 360 F.Supp.2d 697, which found that there was sufficient evidence to admit co-conspirator statements as to those three defendants. However, at that point in the trial, there was little testimony as to Holck and Umbrell, and therefore, the Court delayed making

such a finding as to them. Thereafter, precipitously and without any reason, Holck and Umbrell, who had filed a motion for immediate 104 hearing, withdrew their motion. (N.T. 3/21/04, p. 348). Therefore, the Court never made a specific finding, but relied on Third Circuit case law by deciding to submit the case to the jury, and the Court found that there was sufficient evidence to admit the co-conspirator statements against Holck and Umbrell under Rule 104, and so specifically advised the jury. *See* N.T. 4/7/05, pp. 19–20.

The evidence reviewed on the Rule 29 motion was sufficient to allow the jury to use co-conspirator statements against Holck and Umbrell under the principles stated in *U.S. v. Continental Group Inc.*, 603 F.2d 444 (3d Cir.1979).

Holck and Umbrell argued that the Court erred by failing to allow evidence of consciousness of innocence. The Court dealt with this issue in Memorandum dated March 29, 2005, 362 F.Supp.3d 591, which need not be repeated at this time.

### F. There Were No Violations of Brady v. Maryland or Other Prosecutorial Misconduct

Holck and Umbrell assert that the government introduced false testimony in the grand jury, misled the grand jury as to the facts, violated *Brady v. Maryland* in discovery obligations, engaged in a bad faith pattern of questioning witnesses, and made improper and prejudicial arguments. The Court has considered together all of these different points, presented in Holck and Umbrell's post-trial brief at pages 196–241, and in their reply brief at pages 102–126. The Court rejects these arguments as factually and legally unfounded. The Court has considered and rejected similar *Brady* arguments in the *Kemp* Memorandum, pp. 29–34.

### G. Ex Parte Communication with Deputy Clerk Issue

 Holck and Umbrell assert that there were improper *ex parte* communications between the Court's Deputy Clerk and the jury. Towards the end of the deliberations, on the morning of May 6, 2005, the undersigned convened counsel and their clients to inform them that the prior evening, as the jury was leaving, the Foreperson asked the Deputy Clerk what would happen if they could not reach a verdict. The Deputy Clerk at that time told the Foreperson that the verdict as to guilt or innocence had to be unanimous, and if they could not reach a unanimous decision, the judge must be told that fact. Additionally, on the morning of May 6, 2005, another juror asked the Deputy Clerk whether an attorney involved with the case had passed away, to which she responded affirmatively, as follows:

The Clerk: As the jury was leaving at approximately 4:30–ish, I was asked by the foreperson: what happens if we can't reach a verdict? And I told the foreperson that the verdict was either—

The Court: They couldn't reach a verdict at all or what?

The Clerk: They did not specify one count or another. They said: what happens if we cannot reach a verdict? And I told them that a unanimous verdict must be had either to reach a decision of guilty or not-guilty. If they could not reach a unanimous decision, that the Judge must be told that they were not able to come to a unanimous decision. They asked me what would happen on the counts they were not able to reach a verdict on. Their specific question was: would they be asked in open court individually who voted which way? I told them no. The actual polling as to the

verdict given by the foreperson, that is when they would be actually asked individually if they agreed upon the verdict that the foreperson had given in open court.

The Court: Okay. And that is a fair summary of what took place?

The Clerk: Yes.

The Court: Then this morning I also heard around, somewhere between 9:30, 10:00 o'clock, that one of the jurors then asked Miss Wittje if one of the lawyers working on the case had died. Apparently, this had come to that juror's attention. I don't know how. And she—in your own words again, why don't you say what your response was.

The Clerk: I responded that it was true that an attorney involved with the case had passed although it was not anyone who actively argued the case in court.

D. Br. at 254–55; Govt. Resp. at 217–18 (N.T. 05/06/05, pp. 12–14).

As a result of the information concerning the alleged death of one of the lawyers working on the case,[14] the Court conducted *voir dire* of all the jurors. The purpose was to ascertain whether they had improperly gotten any information from any outside source about the case, and how they heard about this death. Having satisfied itself that the jurors had not read or heard any media or other accounts regarding any other aspect of the trial, the Court concluded no misconduct had occurred. The Court did not *voir dire* jury members regarding the partial-verdict communication, but instead instructed the jury (1) to communicate with the Court only in writing

and (2) at length on the law and proper procedure for partial verdicts. 05–06–05 tr. at 25–31. When thereafter asked by the Foreperson on the record as to the procedure if the jury "feel[s] that [they] have viewed things the best [they] could and [they] realize that [they] are going to probably be split some way," the Court responded: "in that event, you tell me. You would send me a note to that effect." *Id.* at 30–31.

Counsel for Holck and Umbrell do not assert that there was any impropriety about the *voir dire* inquiring about the juror's knowledge of the death of one of the lawyers working on the case. However, they do claim that the Deputy Clerk's communication with the Foreperson, rather than immediately advising the Court about the communication, violated defendants' Fifth and Sixth Amendment rights to counsel and to be present at every stage of the criminal proceeding, as well as Fed. R.Crim.P. 43(a).[15] D. Br. at 258. Specifically, by couching the Deputy Clerk's statements as "supplementary jury instructions" on the law and procedure of partial verdicts, defendants assert the *ex parte* communications were prejudicial *per se* and thus mandate reversal. *Id.* In response, while conceding the communication itself was "improper," the government contends that a "harmless error" standard applies and defendants suffered no prejudice because the Court took immediate action to remedy any error. Govt. Resp. at 217, 220. Defendants reject that harmless error analysis applies, but argue that even if it does, the prosecution fails to meet it burden in showing harmlessness.

---

14. This deceased attorney was an assistant to one of the trial lawyers, who had not formally appeared in the case or said anything during the course of the trial.

15. That Rule provides: "the defendant must be present at: (1) the initial appearance, the initial arraignment, and the plea; (2) every trial stage, including jury impanelment and the return of the verdict; and (3) sentencing."

In *United States v. Toliver*, 330 F.3d 607 (3d Cir.2003), the Third Circuit held that alleged violations of a defendant's right to counsel and right to be present in all trial phases are generally subject to harmless error analysis. *Id.* at 613, 615. In *Toliver*, the judge furnished a portion of trial testimony to the jury at their request without consulting counsel. About fifteen minutes later, the jury asked a second question, at which point the judge convened the attorneys and informed them about both questions. *Id.* at 609. On appeal, as Holck and Umbrell, the defendant argued the incident violated his Fifth and Sixth Amendment rights and that "any error precludes harmlessness, as it is *per se* reversible." The Third Circuit disagreed, holding that harmless error was the proper principle of law applicable to the case. *Id.* at 612–13.[16] Further, since constitutional rights are involved, the government must "prove [harmlessness] beyond a reasonable doubt." *Id.* at 613. Applying that standard, the *Toliver* court found the error harmless given that "no particular prejudice [resulted to defendant] by the trial judge submitting to the jury, with or without the presence of . . . counsel, correct excerpts of limited trial testimony." *Id.* at 617.

Similarly, other circuits courts of appeal have found that even court staff's *ex parte*

actions regarding the substantive law of the case may be harmless error. Notably, in *United States v. Patterson*, 644 F.2d 890 (1st Cir.1981), the First Circuit held that a court clerk's unilateral action to deny the jury's request to make transcripts of witnesses available to them was not prejudicial because only one witness' testimony had been transcribed at that time, and it was "improbable" that the judge would have furnished that one transcript anyway. *Id.* at 897–98. *See also United States v. Fulcher*, 626 F.2d 985, 989 (D.C.Cir.1980) (holding clerk's action in giving requested "mail fraud" and "contract" documents to jury without consulting counsel or judge was error, but defendant was not prejudiced because virtually all exhibits were either contract or mail fraud documents).

At the outset, given the controlling precedent of *Toliver*, the government is correct that harmless error analysis applies to Holck and Umbrell's constitutional claim. That is, "there must be 'no reasonable possibility' of prejudice"—a threshold easily met in this case. *Toliver*, 330 F.3d at 613. Certainly it would have been the better practice for the Deputy Clerk to advise the Foreperson that she could not answer the question herself, but rather that it should be submitted in writing to the judge to insure the query would be answered in open court with counsel pres-

---

**16.** Defendants try to assert that *Toliver* and *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) "mandate[ ] a finding of prejudice *per se* where a defendant was denied counsel in connection with the delivery of supplemental instructions." D. Reply at 129. While *Cronic* held that a defendant's Sixth Amendment right to counsel is presumptively violated, without any showing of prejudice, if the accused is "denied counsel at a critical stage of his trial," the factual premise of the case involved a defendant's right to counsel *during trial*, not an *ex parte* communication with jurors. *Cronic*, 466 U.S. at 659, 104 S.Ct. 2039. Similarly, *Toliver* does not support defendants'

argument that we must find prejudice *per se*. In fact, the *Toliver* court considered and rejected defendant's argument that the absence of counsel during the court's alleged delivery of supplemental jury instructions required automatic reversal. *Toliver*, 330 F.3d at 614. Far from mandating a finding of prejudice, the *Toliver* court never actually addressed exactly whether, and if so which, *ex parte* communications with the jury would constitute a "critical stage" of the criminal proceedings. Instead, it concluded that the judge's providing a transcript to the jury did not trigger *Cronic* and thus harmless error applied. *Id.* at 614–15. Simply stated, counsel for Holck and Umbrell misstate the law.

ent. *Rogers v. United States*, 422 U.S. 35, 39, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975). However, in view of the fact that the Foreperson's question was asked as he was leaving for the day, and that this was brought to the attention of the Court and all counsel immediately the following morning, we glean no prejudice to defendants. First, there is simply no indication whatsoever that Deputy Clerk's comments in any way influenced the verdict. Even accepting *arguendo* defendants' contention that the Deputy's comments "lead the jury to believe that a partial verdict would be accepted by the court," the jury had no time to act on this because the very next several days, before the jury returned a verdict, the Court remedied the error.[17] Second, the Court instructed the jury at length regarding the entire subject matter, so there is simply no chance the jury was misinformed. Finally, there is nothing to suggest the Deputy Clerk's statements were in any way supplemental instructions on substantive principles of law; she merely repeated procedural instructions which the judge had previously given to the jury. *See* N.T. 4/26/05, pp. 12–13. The First Circuit's decision in *Patterson* and the D.C. Circuit's opinion in *Fulcher* are persuasive. Those cases effectively illustrate that even unilateral, *ex parte* statements by court staff to the jury concerning the substantive law of the case may be harmless error if, as here, only accurate and non-prejudicial information is conveyed.

Any error committed was harmless beyond a reasonable doubt.

### III. *Conclusion*

The issues discussed above have been carefully considered. The evidence was sufficient to warrant the guilty verdicts, which were not against the weight of the evidence. Despite numerous allegations of error, the Court concludes defendants Holck and Umbrell received a fair trial.[18]

---

**17.** This case is easily distinguished from two Second Circuit cases cited by defendants where the court found prejudicial error. *See United States v. Mejia*, 356 F.3d 470, 477 (2d Cir.2004) (jury returned guilty verdict fifty minutes after ex parte communication from judge telling jury they should not have disclosed their message of deadlock); *Krische v. Smith*, 662 F.2d 177, 178–80 (2d Cir.1981) (guilty verdict returned one hour and twenty minutes after judge directed jury, without consulting counsel, to continue deliberations after they expressed difficulty in reaching a verdict). In those cases, the jury returned a verdict before the impropriety was revealed. In contrast, this court took prompt action to remedy any error before further deliberations occurred.

**18.** A major issue raised by all defendants in seeking a new trial concerned the Court's excuse of juror no. 11 during deliberations. See *U.S. v. Kemp*, 2005 WL 1006348 (April 28, 2005) and 379 F.Supp.2d at 705–108. On October 25, 2005, in *U.S. v. Rodriguez*, 151 Fed.Appx. 182, 2005 WL 2746595 (3d Cir. 2005), in a non-precedential opinion, the Third Circuit affirmed the defendant's conviction and held, in a different factual context, where one juror flatly refused to deliberate and was excused, that a trial court had discretion to deal with alleged juror misconduct including discretion to determine juror credibility and discretion as to whether *voir dire* of the other jurors was necessary.